[No. H028352. Sixth Dist. May 11, 2006.]

In re the Marriage of CHARLES and ARISTA B. NELSON.
CHARLES NELSON, Respondent, v.
ARISTA B. NELSON, Appellant.

**COUNSEL**

Jonathan Jackel for Appellant.

Bernard N. Wolf and Paul E. Jacobs for Respondent.

**OPINION**

**PREMO, Acting P. J.**—In a dissolution-of-marriage proceeding following a contested trial, the trial court divided community property, confirmed separate property, and ordered Charles Nelson to pay Arista B. Nelson spousal support of $2,000 per month. Arista[1] appeals from the judgment. She contends that the trial court erred by (1) valuing her sole proprietorship business as of the date of separation rather than trial, (2) determining that the marital residence was entirely Charles's separate property, and (3) failing to consider the parties' standard of living during marriage in arriving at the spousal support amount. We agree in part with Arista's marital residence issue. We therefore modify and affirm the judgment.

## BACKGROUND

Charles (then 48 years old) and Arista (then 28 years old) married in 1982. Charles had purchased the marital home in 1965 for $47,500, using a mortgage loan of $39,000 for which the monthly payment was $250. At the time of the marriage, the mortgage balance was $14,725. The parties paid off the balance in 1988, the year in which Arista began a retail business known

---

[1] As is customary in family law cases, we will refer to the parties by their given names for purposes of clarity and not out of disrespect. (See *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1 [30 Cal.Rptr.2d 306].)

as Arista's Flowers and Dolls. The business was never profitable. The parties separated in 1999. After separation, Arista moved the retail business to another location and incurred $41,000 for moving costs and expenses. She closed the business in 2004, shortly before trial.

## DATE OF BUSINESS VALUATION

█ Pursuant to Family Code section 2552, subdivision (a),[2] the general rule is that community assets must be valued "as near as practicable to the time of trial."[3] The trial court may value a community asset at an alternate valuation date on a showing of good cause. (§ 2552, subd. (b).) In this regard, the trial court has considerable discretion to divide community property in order to assure that an equitable settlement is reached. (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 625 [108 Cal.Rptr.2d 833].) "As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it." (*Ibid.*)

Charles's experts could not adequately value Arista's business because of Arista's poor recordkeeping. For example, (1) there was an unexplained loss of $115,000 between 1999 and 2001, (2) gross profit percentage for 2000 and 2001 was inexplicably inconsistent, (3) inventory for December 1999 and January 2001 was inexplicably identical, (4) income statements for 2000 and 2001 were inconsistent with income tax returns for those years, and (5) there existed two disparate 2001 income statements. One expert opined that it was impossible to value a retail business without reliable income statements and balance sheets for the previous three to five years. Charles therefore asked the trial court to value the business as of the separation date and offered his expert's opinion of book value as of that date ($156,000), which the expert extrapolated from Arista's 1998 tax return, August 1999 eight-month income statement, and June 2000 six-month profit-loss statement.

Relying on *In re Marriage of Stallcup* (1979) 97 Cal.App.3d 294 [158 Cal.Rptr. 679], *In re Marriage of Kilbourne* (1991) 232 Cal.App.3d 1518 [284 Cal.Rptr. 201], and *In re Marriage of Stevenson* (1993) 20 Cal.App.4th 250 [24 Cal.Rptr.2d 411], the trial court determined that the date of separation was the appropriate valuation date for Arista's business because (1) the state

---

[2] Further unspecified statutory references are to the Family Code.

[3] Section 2552 provides, "(a) For the purpose of division of the community estate upon dissolution of marriage or legal separation of the parties, except as provided in subdivision (b), the court shall value the assets and liabilities as near as practicable to the time of trial. [¶] (b) Upon 30 days' notice by the moving party to the other party, the court for good cause shown may value all or any portion of the assets and liabilities at a date after separation and before trial to accomplish an equal division of the community estate of the parties in an equitable manner."

of Arista's "record keeping and subsequent disclosures were such that it was difficult if not impossible to calculate the value of this business since the date of separation," and (2) the business "was a sole proprietorship operated by [Arista] alone from the date of separation."

Placed in context within the scope of our review, Arista contends that the trial court abused its discretion by finding good cause to value the business as of the date of separation. She argues that there was no evidence that (1) she "ever tried to hide anything or that her allegedly 'bad bookkeeping' was intentional," and (2) the value of the business as of trial devolved largely from her personal skill, industry and guidance "as opposed to a mere change in value of the capital assets." We disagree with Arista's first point.

■ There is no requirement in a "bad bookkeeping" case that the proprietor must have intentionally created the uncertainty. This subject was discussed in the case of *In re Marriage of Stallcup, supra,* 97 Cal.App.3d at page 301, where the court affirmed a trial court's decision to value community property as of a date near separation. There, the husband had answered the wife's interrogatories regarding business transactions only after the wife's motion to compel answers was granted. He had frustrated efforts by a court-appointed CPA to obtain tax returns and other papers and documents, and the trial court found that he had willfully refused discovery and disobeyed court orders. The trial court noted inconsistencies in the husband's testimony and in his bank loan applications and deposition statements regarding current assets and liabilities. It concluded that the husband was not a credible witness. It valued the property at the earlier date to simplify the accounting and to eliminate the inference that the husband's failure to provide discovery was calculated to conceal unfavorable evidence. On appeal, the court found "both good cause and equitable division" under those circumstances, remarking that "Having failed to provide timely evidence of his claimed post-1973 business reverses, husband may not now benefit from the confusion thus created." (*Ibid.*)

Though the trial court in *Stallcup* inferred that the husband was intentionally concealing information, the appellate holding does not rest upon intentional concealment. The pivotal point of the case is simply that a party may not benefit from confusion for which he or she is responsible. (Civ. Code, § 3517 ["No one can take advantage of his own wrong"].) Stated another way, when a party precludes an expert's trial-date valuation because he or she does not provide needed information, a valuation as of another time is appropriate because it is made "as near as practicable to the time of trial." (§ 2552, subd. (a).)

Here, the trial court accepted that Arista's recordkeeping precluded a postseparation valuation of her business. It was therefore rational to conclude that good cause existed to value the business as of the separation date.

Given that the trial court's good cause finding is justified on this basis, it is unnecessary to examine Arista's second point challenging the trial court's good-cause finding.[4]

## CHARACTER OF MARITAL RESIDENCE

■ Generally, "[w]hen community property is used to reduce the principal balance of a mortgage on one spouse's separate property, the community acquires a pro tanto interest in the property. [Citations.] This well-established principle is known as 'the *Moore/Marsden* rule.' [Citations.]" (*Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1421–1422 [128 Cal.Rptr.2d 31].)[5]

In *Moore*, an unmarried woman bought a house in 1966 by making a down payment and securing a loan for the balance of the purchase price. For a brief period, she also reduced the loan balance through payments from her earnings. She then married, and the loan payments were made with community funds until she separated from her husband in 1977. Thereafter, she made mortgage payments from her own funds until the time of trial. At issue in *Moore* was the determination of the community's percentage interest in the house—which the trial court had found to be the woman's separate property—by virtue of the use of community funds to reduce the loan balance. (*Moore, supra*, 28 Cal.3d at pp. 370–371.) The court held that the loan was a separate property contribution, and that the woman was entitled to credit for

---

[4] "Case law has established that good cause generally exists for a professional practice to be valued as of the date of separation. [Citations.] This exception to trial date valuation applies because the value of such businesses, 'including goodwill, is primarily a reflection of the practitioner's services (accounts receivable and work in progress) and not capital assets such as desks, chairs, law books and computers. Because earnings and accumulations following separation are the spouse's separate property, it follows the community interest should be valued as of the date of separation—the cutoff date for the acquisition of community assets.' (*In re Marriage of Stevenson*[, *supra*,] 20 Cal.App.4th 250, 253–254 [24 Cal.Rptr.2d 411].) [¶] Moreover, 'the rationale for the general exception to trial date valuation is not limited to small law practices. It applies with equal logic to other small businesses which rely on the skill and reputation of the spouse who operates them.' (*In re Marriage of Stevenson, supra*, 20 Cal.App.4th at p. 254 [small general contracting business falls within general *exception* to trial date valuation].)" (*In re Marriage of Duncan, supra*, 90 Cal.App.4th at pp. 625–626.)

[5] *In re Marriage of Moore* (1980) 28 Cal.3d 366 [168 Cal.Rptr. 662, 618 P.2d 208] (*Moore*); *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426 [181 Cal.Rptr. 910] (*Marsden*).

the down payment. (*Id.* at p. 373.) It calculated the woman's separate property percentage interest by adding the amounts of the down payment and the loan, subtracting the amount to which the community payments had reduced the loan balance, and dividing the result by the purchase price. It further calculated the community property percentage interest by dividing the amount that the community payments had reduced the loan balance by the purchase price.

In *Marsden,* the court confronted an issue not addressed in *Moore,* namely, the allocation of prenuptial appreciation on separate property. There, a man bought property and constructed a house in 1962. In so doing, he expended personal funds and obtained a loan, towards which he made payment prior to the marriage. Thereafter, community funds were used to reduce the outstanding loan balance until the parties separated, when the man used his earnings to further reduce this balance. The court concluded that the man was entitled to the full benefit of the prenuptial appreciation on the house. (*Marsden, supra,* 130 Cal.App.3d at pp. 438–440.) Accordingly, in calculating his cash share in the house, the court accorded him all of the prenuptial appreciation, together with a portion of the postnuptial appreciation based on the *Moore* formula. (130 Cal.App.3d at pp. 438–440.)

Charles introduced testimony to the effect that the fair market value of the marital residence was $220,000 on the date of the marriage and $425,000 on the date of separation. His expert calculated from the *Moore/Marsden* formula that the community interest in the residence was $78,147. Charles also introduced testimony that the fair rental value of the residence exceeded $300 per month during the 1980's and $1,000 per month during the early 1990's.

On cross-examination, Charles acknowledged that in 1978 he secured a $30,000 debt owed to his first wife by means of a deed of trust on the residence and that in 1988 he obtained a home equity loan to pay the balance due on that and other debts.

Arista offered no evidence on the marital residence issue.

The trial court accepted $78,147 as the community interest per *Moore/Marsden* but denied the community any interest for purposes of dividing the community property. It explained in its amended statement of decision: "The residence . . . is the separate property of [Charles]. At the time of the marriage, the mortgage balance on the property was only about $14,700. The mortgage was paid off within a few years after their marriage. As a result the parties have lived in [Charles's] home virtually rent free and certainly for far less than they would have had to pay had they been renting a

home. [¶] . . . The evidence . . . was that the *Moore-Marsden* calculation . . . was $78,147. However, [Charles] also presented evidence that the mortgage payments from 1982 through 1988 were about $250 per month. From 1988 until the date of separation in 1999 there was no mortgage owed on the property and the parties lived rent free. [Charles's expert] testified that the fair rental value during the period of time that the mortgage was paid far exceeded $250.00. As a result the Court concludes that the fair rental value use of the property to the to the [*sic*] community far exceeded the *Moore-Marsden* amount, and therefore the community is entitled to zero."

Arista contends that the trial court erred by (1) factoring rental value into the *Moore/Marsden* calculation, (2) failing to factor the home equity loan into the *Moore/Marsden* calculation, and (3) using the separation date rather than the trial date in the *Moore/Marsden* calculation. We agree that rental value is not a factor in the *Moore/Marsden* calculation.

### RENTAL VALUE

California practice guides note that the question of fair-rental-value offset from the community's reimbursement has never been addressed in a California published opinion. (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2006) ¶ 8:312, p. 8-82; Adams & Sevitch, Cal. Family Law Practice (11th ed. 2006) Offset for Rental Value, § K.55.1.1; see generally Reppy, *Acquisitions with a Mix of Gift by Recognizing Shared Ownership or Displacing California's Presumption of Gift by Recognizing Shared Ownership or Reimbursement* (1995) 31 Idaho L.Rev. 965, 968; Bartke, *Yours, Mine and Ours—Separate Title and Community Funds* (1969) 44 Wash. L.Rev. 379, 385.)

The case of *In re Marriage of Camire* (1980) 105 Cal.App.3d 859, 867 [164 Cal.Rptr. 667] (*Camire*), mentions the issue without addressing it. *Camire* rested on an earlier precedent establishing that, where the husband expends community funds on improvements to the wife's separate property, the separate character of the property is not altered, and courts presume that the husband has made a gift of community funds. It held that the community was not entitled to any interest in the wife's separate property although community funds were used to reduce the encumbrance on the property. (*Id.* at pp. 866–867.) It then concluded, "Since reimbursement is precluded by the applicable rule of law discussed herein, we need not determine the propriety of the trial court's determination with respect to the 'fair rental value' of the

property, as a source of 'set-off' to the claim of entitlement to reimbursement to the community." (*Id.* at p. 867.)[6]

We conclude that the Supreme Court has implicitly addressed the issue in *Moore* by declining to offset from the community's reimbursement those expenditures which do not increase the equity value of the property.

In *Moore*, the Supreme Court rejected the husband's argument that interest, taxes and insurance should be included with the mortgage payment in the computation of the community's interest in the wife's separate property. It explained: "*Since such expenditures do not increase the equity value of the property, they should not be considered in its division upon dissolution of marriage.* The value of real property is generally represented by the owners' equity in it, and the equity value does not include finance charges or other expenses incurred to maintain the investment. Amounts paid for interest, taxes and insurance do not contribute to the capital investment and are not considered part of it. A variety of expenses may be incurred in the maintenance of investment property, but such expenses are not considered in the valuation of the property except to the extent they may be relevant in determining its market value from which in turn the owners' equity is derived by subtracting the outstanding obligation." (*Moore, supra,* 28 Cal.3d at p. 372, italics added.)

More important for our purposes, the *Moore* court went on to declare, without mentioning *Camire*: "Upon dissolution, it is the court's duty to account for and divide the assets and the debts of the community. *Payments previously made for interest, taxes and insurance are neither. Moreover, if these items were considered to be part of the community's interest, fairness would also require that the community be charged for its use of the property.*" (*Moore, supra,* 28 Cal.3d at pp. 372–373, italics added.)

We view this latter quote from *Moore* as a rejection of the suggestion that rental value should be an item of credit to the owning spouse when calculating the reimbursement to the community for its contribution to the residence's equity value. Hence, in determining the community's interest in the marital residence, owned as separate property of one spouse, only those community funds which increase that property's *equity* should be considered in property division upon dissolution of marriage. By implication, the Supreme Court held, just as the real property's equity is not influenced by finance charges, it is not influenced by the property's use or occupancy.

---

[6] One commentator "suggested that the *Camire* court's disposition may be explained as an effort to avoid having to deal with the 'hot potato issue' of whether the community should be charged rental for use of the property if credit was given the community for principal reductions." (*In re Marriage of Gowdy* (1986) 178 Cal.App.3d 1228, 1232, fn. 3 [224 Cal.Rptr. 400].)

 The trial court's judgment concludes that Arista owes Charles an equalization payment of $101,544. Given that the trial court made this calculation without taking into account the community interest in the marital residence ($78,147), it follows that the judgment should be modified to credit Arista's equalization payment with one-half of the community interest in the marital residence ($39,073.50), which amounts to a modified equalization payment of $62,470.50.

## HOME EQUITY LOAN

Arista's claim that the *Moore/Marsden* calculation should have accounted for the home equity loan is manifestly without merit.

First, it fails because of insufficient evidence. No evidence shows what amount Charles owed to his first wife on the date of marriage, what amount Charles borrowed on the home equity loan, what amount Charles paid for separate debts, and what amount the community paid on the home equity loan. No calculation can be done knowing only that Charles owed his first wife $30,000 in 1978 and satisfied the obligation balance in 1988 via a home equity loan.

Second, Arista's point fails because the home equity loan is unrelated to the acquisition of the marital residence. The case Arista relies on, *In re Marriage of Branco* (1996) 47 Cal.App.4th 1621 [55 Cal.Rptr.2d 493] (*Branco*), makes this clear.

*Branco* addressed the application of the *Moore/Marsden* rule when community funds from a mortgage secured by separate property are used to pay off a prenuptial loan by which the owner of the separate property bought it. In *Branco*, a woman owned a house that was subject to a mortgage when she married in 1977. In 1978, she and her husband refinanced the mortgage on the house, and used a portion of the loan proceeds to pay off the original mortgage. The court concluded that there was "no meaningful difference, for purposes of determining whether the community acquires an interest in real property, between the use of community funds to make payments on one spouse's preexisting loan and the use of proceeds from a community property loan to pay off the preexisting separate loan." (*Branco, supra,* 47 Cal.App.4th at p. 1627.) It thus stated: "Applied to the present case, the community

property interest in the home would be computed by dividing the community's contribution to the purchase price of the home (payments reducing principal made with community funds on the original loan, if any, plus the principal balance of the loan paid off with proceeds [from the postnuptial mortgage]) by the purchase price. This percentage would then be multiplied by the appreciation of the home during the years of the marriage." (*Id.* at p. 1629.) It added that the separate property share included "one-half of the community interest in the appreciation during marriage, as well as all the appreciation before the marriage and after separation, the down payment and payments reducing principal on the original loan made before the marriage." (*Ibid.*)

■ Thus, the rule in *Branco* is a special application of the *Moore/Marsden* rule. Under *Moore*, the separate property percentage interest, like the community's percentage interest, is determined relative to the *original purchase price.* Broadly speaking, the separate property interest is the ratio (in percentage terms) of the separate property owner's contribution to the payment of this price—including separate property loans—over the price itself. (*Moore, supra,* 28 Cal.3d at p. 373; see *Marsden, supra,* 130 Cal.App.3d at pp. 436–437.) Analogously, the community's interest is the ratio (in percentage terms) of what is effectively the community's contribution to the payment of this price—that is, the extent to which community funds have reduced the balance owed on separate property loans used to purchase the property—over the price itself. (*Moore, supra,* 28 Cal.3d at p. 373; see *Marsden, supra,* 130 Cal.App.3d at pp. 436–437.)

In short, *Branco* held that the expenditure of funds from a community property loan to pay off a separate property loan used to buy the property constitutes a community contribution under *Moore/Marsden.* Here, Charles's debt to his first wife was not for a loan used to buy the marital residence (at least no evidence suggests that this was the case). The home equity loan was therefore not substituted in whole or in part for a purchase money loan. It follows that the community payments on the home equity loan did not confer on the community a pro tanto interest in Charles's separate property.

Arista alternatively argues that payments on a home equity loan used for purposes having nothing to do with acquisition of a marital residence nevertheless constitute a community contribution under *Moore/Marsden.* But she cites no authority for the proposition. And the dearth of evidence on the point is fatal in any event.

Arista finally claims that the community should receive a credit because the home equity loan was used to pay Charles's separate debts. Again, no credit can be calculated given the dearth of evidence. In any event, Arista did not raise this issue in the trial court. " ' "An appellate court will ordinarily not consider procedural defects or erroneous rulings, in connection with relief sought or defenses asserted, where an objection could have been, but was not, presented to the lower court by some appropriate method . . . . The circumstances may involve such intentional acts or acquiescence as to be appropriately classified under the headings of estoppel or waiver . . . . Often, however, the explanation is simply that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial." ' [Citation.] ' "The purpose of the general doctrine of waiver is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . ." ' [Citation.] ' "No procedural principle is more familiar to this Court than that a constitutional right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." [Citation.]' [Citation.]" (*People v. Saunders* (1993) 5 Cal.4th 580, 589–590 [20 Cal.Rptr.2d 638, 853 P.2d 1093], fn. omitted.)

## SEPARATION DATE

Arista's argument that the trial court should have calculated *Moore/Marsden* as of the trial date rather than the separation date also manifestly fails. It fails because Charles submitted evidence and argued for a separation-date valuation and Arista submitted no evidence for a trial-date valuation.[7] Arista concedes that she "did not present any expert testimony to prove the value of the real property as of the date of trial." During argument, when she urged the trial court to bring the figures "forward close to the date of trial to determine the values," the trial court remarked, "You're right, counsel, it hasn't been done. So is the court supposed to pull some figure out of the sky?"

Arista argues that the trial court could have appointed an expert pursuant to Evidence Code section 730. But she did not request the trial court to appoint one.[8] We observe that a trial court would likely be acting within its discretion by denying such a request made during argument after trial.

---

[7] Arista also did not object to the separation-date valuation on the ground that Charles had not filed a motion to establish good cause for a separation-date valuation.

[8] When confronted by the trial court's "figure out of the sky" truism, Arista merely posed that "the court could order an appraisal."

## SPOUSAL SUPPORT

█ Spousal support is governed by the statutory scheme set forth in sections 4300 through 4360. Section 4330 authorizes the trial court to order a party to pay spousal support in an amount, and for a period of time, that the court determines is just and reasonable, based on the standard of living established during the marriage, taking into consideration the circumstances set forth in section 4320.[9] (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 302–303 [111 Cal.Rptr.2d 755] (*Cheriton*).)

" 'In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it.' [Citation.] In balancing the applicable statutory factors, the trial court has discretion to determine the appropriate weight to accord to each. [Citation.] But the 'court may not be arbitrary; it must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth in [the statute], especially reasonable needs and their financial abilities.' [Citation.] Furthermore, the court does not have discretion to ignore any relevant circumstance enumerated in the statute. To the contrary, the trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support. [Citations.] Failure to do so is reversible error." (*Cheriton*, *supra*, 92 Cal.App.4th at p. 304.)

Here, the trial court expressly applied all of the applicable statutory factors in determining the amount of spousal support. Among the most relevant factors that it mentioned were that (1) Arista earned $2,500 per month from

---

[9] The circumstances listed in section 4320 include: "(a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following: [¶] (1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment. [¶] (2) The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties. [¶] . . . [¶] (c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living. [¶] . . . [¶] (g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party." (§ 4320, subds. (a), (c), (g).) Section 4320, subdivision (l) provides: "The goal [is] that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties."

employment and $1,500 per month from selling her inventory, (2) evidence supported that Arista could earn at least $40,000 per year from employment, (3) Charles was 70 years old and could be expected to retire at any time, and (4) Arista's declarations showed monthly expenses of approximately $4,800 per month. It stated: "After consideration of the above factors the Court has concluded that a reasonable amount of support at this time is $2,000 a month, which combined with the $3,500 a month that she can earn currently would reasonably provide for her needs as set forth in her Income and Expense Declaration."

Arista contends that the trial court abused its discretion in setting spousal support because it considered her current standard of living rather than the marital standard of living. She relies on the following provision in the judgment: "Standard of living: It has been five years since the parties have separated and [Arista] has established her own standard of living since then. The Court has several income and expense declarations from [Arista] filed in this period and can gauge the appropriate level from that." This analysis is erroneous.

██ Section 4330 does not make "marital standard of living" the absolute measure of reasonable need. "Marital standard of living" is merely a threshold or reference point against which all of the statutory factors may be weighed. (*In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 48, fn. 11 [272 Cal.Rptr. 560].) It is neither a floor nor a ceiling for a spousal support award. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 485 [274 Cal.Rptr. 911].) The Legislature intended "marital standard of living" to be a general description of the station in life that the parties had achieved by the date of separation. (*Ibid.*)

Given that the legal standard, "marital standard of living," is a mere general reference point and Arista does not contest the trial court's balancing of the specific statutory factors, we find no abuse of discretion. In any event, we observe that, again, Arista did not make the argument to the trial court that she makes here. She offered no evidence of or argument on her marital standard of living. Rather, she (1) urged that her needs had not changed since the trial court had set temporary spousal support at $2,500 per month, and (2) asked that permanent spousal support be set in the same amount. The trial court unquestionably followed this lead in focusing on Arista's needs as set forth in the income and expense statements. It cannot be faulted for doing so. (*People v. Saunders, supra,* 5 Cal.4th at pp. 589–590.)

## DISPOSITION

The judgment is modified so that Arista's equalization payment is set at $62,470.50. As so modified, the judgment is affirmed. Each party to bear his or her own costs on appeal.

Bamattre-Manoukian, J., and Duffy, J., concurred.