Filed 2/19/16  Marriage of Antoniadis CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of CHRISTINE and ROBERT ANTONIADIS. | D066644 |
| CHRISTINE ANTONIADIS, | |
| Respondent, | (Super. Ct. No. D540433) |
| v. | |
| ROBERT ANTONIADIS, | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David B. Oberholtzer, Judge.  Affirmed.

Merker & McDonald and Danny R. McDonald for Defendant and Appellant.

Stephen Temko and Dennis G. Temko for Plaintiff and Respondent.

Robert Antoniadis (Husband) appeals several aspects of the disposition of property in this judgment of dissolution.  He initially contends that the trial court erred as a matter of law in ruling that respondent Christine Antoniadis (Wife) is entitled to receive as her separate property a family residence that was purchased during the marriage (the

residence). Husband contends the Family Code section 760 presumption that property acquired during marriage is community property must be dispositive, and thus the court erred in applying methods for tracing and crediting Wife's separate property funds that were utilized to make the down payment and mortgage payments on the residence.[1] (*In re Marriage of Valli* (2014) 58 Cal.4th 1396, 1406 (*Valli*).) Alternatively, Husband argues Wife failed to present substantial evidence in support of her showing she could trace her separate property contributions that paid for the residence, either through direct tracing or the family expense method. (*In re Marriage of Walrath* (1998) 17 Cal.4th 907, 920, fn. 5.)

Husband presents a separate contention that the trial court erred in concluding that the parties' 2003 estate plan, which included placement of the residence into family trust ownership, did not result in transmutation of the residence into community property. (§ 852, subd. (a);[2] *In re Marriage of Starkman* (2005) 129 Cal.App.4th 659 (*Starkman*).) In the alternative, Husband contends he is entitled to reimbursement for payments that the

---

[1]    Family Code section 760 provides: "Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property." All further statutory references are to this code unless noted.

[2]    Section 852, subdivision (a), provides: "A transmutation of real or personal property is not valid unless made in writing by an express declaration that is made, joined in, consented to, or accepted by the spouse whose interest in the property is adversely affected."

community had presumably made toward paying down the mortgage on the residence. (§ 2640.)[3]

Finally, Husband argues the trial court erred in placing a value on the community real estate business, RACA, by including the value of certain commissions received after the date of separation, although the court's special master had not taken them into account. (See *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 631 (*Duncan*) [valuation is a factual issue]; Evid. Code, § 730 [court appointed expert].) Having reviewed the record and the arguments, we find sufficient evidence supports the judgment, and there was no abuse of discretion in the court's findings. We affirm.

I

*OVERVIEW OF RECORD*

A. Assets and Disputes

After Husband and Wife were married in 1988, they developed and worked at a distribution business in Vermont. In 2000, Husband filed for personal bankruptcy and the business failed. Wife and their two children moved to California, and Husband soon followed. When Wife's parents, who had lived in Canada, passed away in the early 2000's, she received an inheritance of over $1.2 million in U.S. dollars ($1.6 million in Canadian dollars), as her separate property. She deposited it all into a Royal Bank of Canada inheritance account (the Canadian account).

---

3     Section 2640, subdivision (b) provides in part that "unless a party has made a written waiver of the right to reimbursement . . . , the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source."

3

Instead of renting a family residence, the couple decided in 2002 that Wife would use her separate property to acquire a home in Mission Beach (724 Seagirt Court; the residence). The purchase price was $675,000, and Wife used $249,871 of her separate property funds (designated $250,000 here) as the down payment. Title was taken by Wife as her separate property, and she was responsible for the mortgage. As part of the mortgage transaction, Husband signed a quitclaim deed in Wife's favor. As part of the couple's 2002-2003 estate plan involving a revocable and restated trust, title to the residence was transferred several times between trust ownership and Wife's separate property, until the parties separated on December 31, 2012.

After receiving the inherited funds, Wife regularly withdrew money from her Canadian account for family living expenses and mortgage payments, depositing it in a community property Wells Fargo account (also in her name alone). She had an accounting degree and kept the books for the family, which maintained a comfortable middle class lifestyle, including private schools for the children. Husband testified that from 1986 to 2007, his income varied from zero to $300,000.

From 2007 until their separation, the parties co-owned and worked at a real estate business, RACA. Husband obtained real estate licenses and he worked up to 70 hours per week, while Wife spent about 10 hours a week on its office work. After starting the business, Husband waived some of his real estate commissions for the purpose of increasing his professional profile, and he did not take significant income from the

4

business until after 2010.  By the time the couple separated, Wife's Canadian account had approximately $130,000 left in it.[4]

We will set forth additional relevant details from the record in connection with discussing the characterization of the residence, through the tracing of Wife's separate property funds.  (Pt. II, *post*.)  More facts will be provided during our discussion of the transmutation issues, concerning the placement of the residence, at times, into family trust ownership.  (Pt. III, *post*.)  We also defer outlining the facts relevant to Husband's claims of insufficient evidence to support the ruling that disposed of the couple's RACA business.  (Pt. IV, *post*.)[5]

### B.  Summary of Statements of Decision

At the conclusion of trial, Husband requested a written statement of decision limited to the characterization of the residence property.  Regarding the award of the RACA business to Husband, the court analyzed the expert testimony presented and made an oral statement of decision.  To provide background for the issues raised on appeal, we next summarize the trial court's rulings.

The written statement of decision first discussed the proper characterization of the residence, referring to evidence about Wife's separate property contributions to the down

---

[4]     As of the time of trial, June 2014, Wife's Canadian account had a balance of $52,150.  Husband testified about his January to July 2013 income and expense declarations which said he had zero income, although in July 2013, he had a business cashier's check on hand for $50,000, which he used to avoid paying child support.

[5]     Although the judgment resolved other issues between the parties, including spousal support and attorney fees and costs, none of those orders is challenged on appeal.

payment and monthly payments on the debt for the residence. Although she testified she used a total of $520,761 in checks and withdrawals from her Canadian account, toward expenses of the residence, she could only provide a portion of the financial records, but insisted there were more.

The court concluded that the only plausible reason for Wife making the large withdrawals from her Canadian account, many of which were in round numbers, was to pay down the principal on the mortgage. That evidence supported her claim that the residence was her separate property when it was purchased. Husband had not made any objections at trial to her testimony that her separate property was consistently used to pay down the mortgage and to pay living expenses, through use of the Wells Fargo family account.

Regarding the community assets, Husband had testified to earning only modest commissions before 2010. The court therefore found it was more likely than not that Wife was making the mortgage payments from her Canadian accounts while the couple was transferring the residence in and out of their family trust in 2002 and 2003.

With respect to the transmutation issues argued, the court outlined the evidence about the various deeds for the residence, which showed that Wife took title to the residence in June 2002 as her separate property. The parties then decided to establish a revocable trust as an estate planning device, and in December 2002, Wife signed a quitclaim deed to Husband and herself as community property. That deed and a Husband/Wife deed transferring title to the family trust were recorded in February 2003. In June 2003, to facilitate refinancing the residence, the trust deeded the property back to

6

Wife as her separate property. There were no more deeds produced in evidence except for a recorded March 2011 trust transfer deed by Husband and Wife as joint tenants (signed Jan. 4, 2011), transferring the residence to the family trust. The restated family trust was also dated January 4, 2011. The court's statement of decision noted, "No one can explain why the March 2011 deed stated the grantors were Robert and Christine as joint tenants, which they were not--the last deed recorded before that had listed Christine as the sole owner."

From that evidence, the court concluded that placing title to the residence into the trust did not support any inference that the parties intended to transmute it into community property, particularly since they had also placed the Canadian accounts in the trust, but it was undisputed that the Canadian accounts never were or became community property.

To finally resolve the dispute about the division of the residence interests, the court acknowledged the presumption under section 760 that property acquired during the marriage is presumed to be community property, unless acquired by gift or bequest. Wife had the burden to prove otherwise by a preponderance of the evidence. (§ 760.) The court then concluded that Wife had satisfied her burden of proof to show the residence was purchased as separate property, by tracing the purchase funds to her separate property as of the time of acquisition. At that time, the community was bankrupt and still recovering from the Vermont business failure in 2000.

The court next addressed whether Husband had satisfied his burden to prove under section 850 that the residence was later transmuted to community property. This statute

required an express written declaration by Wife unambiguously indicating a change in the character or ownership of the property. The court concluded that the family trust deeds, both in 2002 and 2003 and in March 2011, were insufficient to prove an express transmutation. Because of that failure of proof, the court declined to make a determination of whether there had been any undue influence exercised between spouses or any violation of fiduciary duties. (§§ 721, 1100.) Consequently, the court was not required to make any express findings on any right to reimbursement issues for the purchase and payments on the residence. (§ 2640, subd. (a) [" 'Contributions to the acquisition of property,' as used in this section, include down payments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or improvement of the property but do not include payments of interest on the loan or payments made for maintenance, insurance, or taxation of the property."].)

In its oral statement of decision on the RACA business, the court assigned a value to the business of $47,681 as of the date of separation, and awarded it to Husband, conditioned on his making an equalizing payment to Wife of half that amount. The court determined that contrary to a portion of the appointed expert's report and testimony, there was additional business income from three identified real estate listings that were entered into shortly before the date of separation. Since those deals had closed shortly after the date of separation, the value of those commissions was essentially earned when they were signed up and they were community property assets.[6] There was a lack of evidence

---

[6] During that time frame, Husband sold three Point Loma properties, Del Cerro, Nipoma, and Locust, and received commissions. For many other sales, including the

about the value of a fourth such waived commission (Plum) and the court accepted the expert's deletion of the worth of that commission from the business value.

Judgment was prepared accordingly and Husband appeals.

II

*CHALLENGES TO THE COURT'S FINDINGS ON TRACING*
*OF SEPARATE PROPERTY*

A.  Nature of Inquiry on Appeal

Section 760 reads, "Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property."  Initially, Husband seeks to have this court begin and end the analysis with section 760, by concluding that the residence, acquired during the marriage, cannot be other than community property.  He argues for de novo review of the trial court's decision on the residence characterization, solely as a matter of statutory construction.  (See, e.g., *Kizer v. Hanna* (1989) 48 Cal.3d 1, 8 [plain meaning rule]; see *In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1371-1372 [de novo review of scope of statute].)

Husband acknowledges that other portions of the Family Code create exemptions from the statutory community property definition for certain types of separate property, such as gifts, inheritances, and earnings while spouses are separated.  (§§ 770, 771; *In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1103.)  He relies on a debate in case law on whether "a common law rule codified in Evidence Code section 662" should have equal

fourth such property (Plum), Husband waived receiving a commission, in order to obtain benefits from his business's increased visibility in the community.

effect with Family Code presumptions in an action between spouses, on a determination of whether property acquired during a marriage is community or separate. (*Valli, supra,* 58 Cal.4th 1396, 1406 [majority opinion, declining to decide between effectiveness of companion presumptions]; see pp. 1407-1412 [concurring opinion, J. Chin]; *In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 294-295 (*Haines*) [effect of Evidence Code section 662 in this context].)

Husband's theory that the terms of section 760 control the analysis would require us to disregard numerous California Supreme Court opinions that have applied its provisions and presumptions to various fact situations. The majority opinion in *Valli,* *supra,* 58 Cal.4th 1396, 1399-1400, discusses previous case law on whether the parties' assets are community property or separate property, stating that while the analysis begins with section 760, it continues through a tracing process on whether an asset's acquisition was "(1) traceable to a separate property source [citations, e.g., *In re Marriage of Mix* (1975) 14 Cal.3d 604, 610 [(*Mix*)]), (2) acquired by gift or bequest [§ 770, subd. (a)(2)] or (3) earned or accumulated while the spouses are living separate and apart [§ 771, subd. (a)]." (*Valli, supra,* at p. 1400.) A preponderance of the evidence is required to prove the effect of a traced separate property source on the characterization of property, or on rights of reimbursement. (*Ibid.*)

When the Legislature enacted the Family Code in 1992, it did not intend to make major substantive revisions to existing family law. (11 Witkin, Summary of Cal. Law (10th ed. 2005) Community Property, § 2, p. 531.) California Supreme Court jurisprudence accepting there is a methodology for tracing separate property interests in

community property goes back at least to *See v. See* (1966) 64 Cal.2d 778, 783 (*See*). (11 Witkin, Summary of Cal. Law, *supra*, § 17, pp. 544-546.)[7] The classic analyses applicable to tracing separate property contributions, as set forth in *Mix*, *supra*, 14 Cal.3d 604, 610-614, are grounded in statutory presumptions and legal applications of them. As an intermediate appellate court, we are unable to accept Husband's invitation to create what he would consider to be "the better rule" for applying section 760, i.e., to conclude that "no nonstatutory exception continues to have viability . . . ." (*Auto Equity Sales v. Superior Court* (1962) 57 Cal.2d 450, 455.) We are constrained to apply established rules in this context.

### B. Standard of Review; Methods of Tracing

We examine the legal and factual bases for the trial court's conclusion that the residence was and remained Wife's separate property. The court found that she had provided sufficient evidence to trace her separate property Canadian account funds, both in making the down payment and the bulk of the subsequent mortgage payments. (We defer until pt. III, *post*, analysis of whether Husband was nevertheless able to show that the residence was transmuted into community property at one or more points, such that

---

[7] Early cases discussing family living expense tracing and direct tracing arose in the legal context of property *characterization* rather than *reimbursement*. (*See, supra,* 64 Cal.2d 778, 783; *Mix, supra,* 14 Cal.3d 604, 612; *Estate of Murphy* (1976) 15 Cal.3d 907, 918; *Hicks v. Hicks* (1962) 211 Cal.App.2d 144, 157.) The same tracing methodologies are now employed in cases where tracing is conducted to obtain reimbursement under section 2640. (*Walrath*, *supra,* 17 Cal.4th at p. 920, fn. 5; *In re Marriage of Braud* (1996) 45 Cal.App.4th 797, 823-824 (*Braud*); *In re Marriage of Stoll* (1998) 63 Cal.App.4th 837, 841 (*Stoll*).)

11

he should obtain a right to reimbursement for community contributions under section 2640.)

"Whether the spouse claiming a separate property interest has adequately traced an asset to a separate property source is a question of fact for the trial court, and its finding must be upheld if supported by substantial evidence." (*Braud*, *supra*, 45 Cal.App.4th 797, 823.) A reviewing court examines the record in the light most favorable to the judgment. (*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71.)

"It is hornbook California family law that tracing is done either directly, or by a process of elimination whereby a spouse shows the exhaustion of available community funds at the time of acquisition." (*Stoll*, *supra*, 63 Cal.App.4th 837, 841.) "Under the 'direct tracing' method, the disputed asset . . . is traced to the withdrawal of separate property funds from the commingled account. This method requires *specific records* reconstructing each separate and community property deposit, and each separate and community property payment as it occurs. Separate property status cannot be established by mere oral testimony of intent or by records that simply total up all separate property funds available during the relevant period and all the separate expenditures during that period; such records do not adequately trace to the source of the purchase at the time it was made." (*Braud*, *supra*, 45 Cal.App.4th at p. 823; original italics.)

The second method, a "family living expense" approach, does not require very detailed records that show each transaction in the parties' financial accounts. For purposes of tracing under the family living expense method, "[c]ommunity expenses may be shown by circumstantial evidence." (*Price v. Price* (1963) 217 Cal.App.2d 1, 8.)

12

"Under the 'family living expense' or 'recapitulation' method, it is assumed that family living expenses are paid out of community property funds. [Citations.] Payments may be traced to a separate property source by showing community income at the time of the payments or purchase was exhausted by family expense, so that the payments or purchase necessarily must have been made with separate property funds. [Citations.] The recapitulation must be sufficiently exhaustive to establish not only that separate property funds were available to make the payments, but that they were actually used. [Citation.] [T]he record must demonstrate that community income was depleted at the time the particular asset was acquired." (*Braud*, *supra*, 45 Cal.App.4th at pp. 823-824; *Mix*, *supra*, 14 Cal.3d at p. 612.)

### C. Relevant Record on Tracing Issues; Analysis

At trial, Wife presented evidence on each method of tracing. First, regarding direct tracing, it was essentially not disputed at trial that the $250,000 down payment on the residence was Wife's separate property. Husband argued in closing that assuming the residence should be designated community property, Wife should then be entitled to a $250,000 credit for her separate property contribution (down payment). (§ 2640.)

The matter was contested on whether the ongoing mortgage payments on the residence were provided exclusively or largely by Wife's separate property. Husband argues that Wife failed to provide a sufficient number of checks and bank statements to support her testimony that she contributed $520,761 in separate property funds toward paying the mortgage and improvements to the residence (new flooring). From the year 2000 through 2012, Wife withdrew funds from her Canadian account to pay for the home

13

purchase and mortgage payments, as well as other family living expenses. She had a practice of depositing the Canadian checks into a family Wells Fargo checking account. In that way, she used $250,000 from the Canadian account to make the down payment, and she estimated there was another $250,000 used from it for mortgage payments on the residence. Through 2012, up to $1.5 million (Canadian dollars) of her separate property inheritance funds were spent on the purchase and mortgage for the residence and other family living expenses. The evidence had showed that in 2002, Wife and Husband originally agreed to place title to the home in her own name. Although several trust transactions followed, they were not directly discussed by the court in this context.

Although Wife did not supply full documentation of the decade of mortgage and banking transactions, she was able to show the availability of her separate Canadian account funds on given dates. Wife's testimony that her separate Canadian account was gradually becoming depleted through spending on expenses for the residence, as well as other living expenses, was deemed credible by the trial court. (*Price v. Price*, *supra*, 217 Cal.App.2d 1, 8 [community expenses may be shown by circumstantial evidence].) In the statement of decision, the court relied on several trial exhibits as backing up her testimony, the available checks and statements, payable to the mortgage servicing company or cash. Since some of the checks were in even dollar amounts (e.g., $ 4,000-$5,000), while the mortgage bills were for odd amounts (e.g., $3,692.82), the court surmised that some large checks to the mortgage company were being used to pay down the principal on the loan, as would be consistent with Wife's claim to the residence as her separate property.

14

Generally, the evidence showed that the salaries of the couple were minimal compared to their community expenses, at least through 2010, when Husband began to earn significant commissions. Around 2006, Husband obtained a loan of $62,000 from Wife's brother. The court noted that Husband had not controverted the testimony that the main source of the funds in the family Wells Fargo account was Wife's separate Canadian account. No other consistent sources of community income had been identified for that period. Moreover, the court relied on the evidence that the business failure in Vermont had bankrupted the community, to conclude that as of the time of acquisition in 2002, the community did not have income or a down payment to qualify for the mortgage on the residence. (See *Haines*, *supra*, 33 Cal.App.4th 277, 291 [time of acquisition of property determines its status as community or separate].) From the available evidence and testimony, the court concluded that Wife had satisfactorily traced the money from her Canadian account into the bills for expenses of the residence, as direct tracing, especially since there was no significant controverting showing by husband. (See *Mix*, *supra*, 14 Cal.3d at p. 613.) The record substantially supports this finding.

Although the court did not expressly rely on the alternate method of tracing (family living expense), evidence was presented to show there were insufficient community funds to have contributed significantly to the acquisition of and payment for the residence between 2002 and 2010. The RACA business was not incorporated until 2007, Husband did not earn significant commissions until at least 2010, and separation occurred in 2012. The court discussed the ongoing use of Wife's Canadian account funds for various family living expenses, and took note of the evidence showing that the

15

community was bankrupt for some time after 2000. The court made express and implied findings that the community funds had been exhausted and thus it was unlikely that the residence expenses were paid by the community, for most of the relevant time period. (*Braud*, *supra*, 45 Cal.App.4th at p. 823.)

Moreover, the trial court's statement of decision expressed concern about the credibility of the parties, noting that each of them testified at times to things they wished were true but were probably not true, understandably with respect to long ago events. The court then noted that Husband had testified about several items that he knew not to be true, and therefore, when the parties' testimony differed on the financing of the residence, the court tended to favor Wife's view. The court was entitled to take into account the respective credibility of the witnesses and on appeal, we have been given no basis to contradict it. (*Braud*, *supra*, 45 Cal.App.4th 797, 823 [trial court's resolution of disputed factual issues to be upheld where supported by substantial evidence].)

Before we can draw any final conclusions about the sufficiency of the trial court's findings that the residence was and is the separate property of Wife, we turn to the related transmutation issues arising from the parties' use of the family trust as an estate planning device.

III

*TRANSMUTATION ISSUES*

Husband contends the trial court should have analyzed the evidence as showing that even if the residence were originally deemed to be Wife's separate property, the deed from Wife to "Husband and Wife" as community property (executed in Dec. 2002 but

16

recorded in Feb. 2003), clearly satisfied the standards of section 852. Subdivision (a) of that section requires a transmutation from separate property to community to be in writing by "express declaration." Husband claims that when the factual context of estate planning and the use of a revocable trust is properly considered, the recorded deed and the related trust transactions (including the 2011 trust transfer deed from the couple as joint tenants) sufficed to indicate a change in the character and the ownership of the property. (*Starkman, supra*, 129 Cal.App.4th at p. 664.)

A. Applicable Legal Principles

In *Estate of MacDonald* (1990) 51 Cal.3d 262 (*MacDonald*), the court concluded a writing signed by the adversely affected spouse is not an "express declaration" for purposes of section 852, subdivision (a), "*unless* it contains language which expressly states that the characterization or ownership of the property is being changed." (*MacDonald*, *supra,* at p. 272; original italics.)[8] The court further concluded the determination of whether a writing meets the "express declaration" requirement must be made without resort to extrinsic evidence. (*Ibid.*) The determination of whether a written document constitutes a transmutation is subject to de novo review. (*In re Marriage of Barneson* (1999) 69 Cal.App.4th 583, 588, 591 (*Barneson*) [a "transmutation may be

---

[8] The court in *MacDonald, supra,* 51 Cal.3d 262, 267-272, was analyzing a predecessor statute, Civil Code section 5110.730, which also invalidated attempts to transmute property unless certain conditions were met. The court's statements apply equally to current section 852. (*Starkman, supra,* 129 Cal.App.4th 659, 663-664.) Section 852, subdivision (b) pertains to the requirements for a transmutation of real property (not effective as to third parties without notice, unless recorded), and it does not appear to apply here. Likewise, subdivision (c) of the section does not apply (gifts between spouses).

17

effected by means of a transfer, but a transfer is not necessarily a transmutation"]; *Cox Cable San Diego, Inc. v. City of San Diego* (1987) 188 Cal.App.3d 952, 958.)

The court in *Starkman, supra,* 129 Cal.App.4th 659, addressed whether documents that transferred the husband's separate property into a revocable trust, created by the husband and wife for estate planning purposes, satisfied the requirements of *MacDonald, supra*, 51 Cal.3d at page 272, for an "express declaration" under section 852, subdivision (a) (i.e., changing the characterization or ownership of the property). In *Starkman,* the court held the trust instruments were insufficient to constitute a transmutation, relying on the record showing that the husband and wife had created the trust to avoid probate and to administer their estate in the event of death. It was not evidently the purpose of the trust to transmute the husband's substantial separate property into community property. (*Starkman, supra,* at p. 664.) The court declined to consider extrinsic evidence beyond the trust documents, such as an attorney warning letter. (*Id.* at p. 665, citing *MacDonald*, *supra*, 51 Cal.3d at pp. 271-272.) "A party does not 'slip into a transmutation by accident.' " (*Starkman*, *supra*, at p. 664.)

*In re Marriage of Holtemann* (2008) 166 Cal.App.4th 1166 (*Holtemann*) distinguished the analysis of *Starkman, supra*, 129 Cal.App.4th 659, because the documents before the court in *Holtemann* had used the "unique and specific term of art," "transmutation," leading to the conclusion that the parties had clearly chosen that disposition of property. (*Holtemann, supra,* at p. 1173.) There, the main document was entitled, "Spousal Property Transmutation Agreement," and the trust document expressly transmuted certain of Husband's identified separate property to community property. (*Id.*

18

at pp. 1169-1170.)  "Regardless of the parties' motivations underlying the documents, they contained the requisite express unequivocal declarations."  (*Id.* at p. 1173.)

B.  Relevant Record on Estate Planning/Trust Issues

In the original June 2002 deed, Wife took title to the residence as her separate property.  In connection with establishing their estate plan in December 2002, Wife signed a quitclaim deed to Husband and herself as community property.  Both that deed and a deed transferring title to the family trust were recorded in February 2003.  In July 2003, to facilitate refinancing the residence in Wife's name, Husband and Wife, as trustees, deeded the property back to Wife as her separate property.  No other deeds were produced in evidence except for the March 2011 trust transfer deed from Husband and Wife as joint tenants, granting the residence to the family trust.  The 2011 restated trust was also admitted into evidence.

During closing argument, Husband's attorney mainly argued that despite the sequencing of the deeds, there was an understanding between the parties that the residence would be community property.  He claimed that the use of the separate property designations was merely for financing and refinancing, because of Husband's bankruptcy and bad credit, such that Wife had a fiduciary duty to reconvey title to the community.

As noted, the court's statement of decision observed that the record was unclear "why the March 2011 deed stated the grantors were Robert and Christine as joint tenants, which they were not -- the last deed recorded before that had listed Christine as the sole owner."  The burden had shifted to Husband to prove, by a preponderance of the

19

evidence, that the residence had been transmuted into community property. (§ 852, subd. (a).) Pursuant to the authority of *MacDonald, supra*, 51 Cal.3d 262, the court declined to consider testimony or other extrinsic evidence. Husband's only admissible evidence, the written deeds transferring the residence into the family trust and the restated trust, did not provide a showing with the requisite specificity that Wife had made an express written declaration to unambiguously indicate her intent to change the character or ownership of the property. (*Starkman, supra,* 129 Cal.App.4th at p. 662.)

In particular, the court noted that the restated trust, at its paragraph 2.A, declared that the property described in the attached schedule (the residence and the Canadian and Wells Fargo bank accounts) was their community property, and that community property transferred into the trust retained its character as such. However, since Husband had conceded the Canadian account was never community property, the trust documents likewise did not support any inference that the parties had intended to transmute the separate property residence into community property. (*Barneson*, *supra*, 69 Cal.App.4th at p. 591 [a transfer is not necessarily a transmutation].)

The court concluded that Husband's evidence did not satisfy his burden of proof for transmutation, and consequently, "the court has no call to analyze the spouses' fiduciary duties to one another [citations] or a presumption of undue influence."[9]

---

[9] "Section 721 . . . creates a broad fiduciary relationship between spouses in their transactions with each other. This relationship 'imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.' " (*In re Marriage of Simmons* (2013) 215 Cal.App.4th 584, 590.) Section 1100 recognizes the fiduciary duty of spouses in the management and control of community personal property, and section 1101 provides remedies for breaches of same.

20

C.  Analysis; No Transmutation; No Undue Influence Issues Resolved

We examine whether the deeds and trust relied upon by Husband amounted to Wife's "express declaration" of transmutation within the meaning of section 852, subdivision (a).  This was a revocable trust, stating at its paragraph 8 that on revocation, the settlors would receive their property back.  The trial court could reasonably conclude that merely listing both community and separate property on the trust's Schedule A did not serve as an express transmutation.  The original deeds and trust transactions did not contain clear and unambiguous language to change the characterization or ownership of property.  (*Barneson*, *supra*, 69 Cal.App.4th at p. 590 [term "transfer" has multiple definitions and can be ambiguous].)

Husband seeks to characterizes the trust's 2003 deed transferring the residence to Wife as her separate property as merely a financing device that was consistent with continued community property status.  However, the 2011 trust transfer deed from the couple as joint tenants to the trust still had no foundation in any deed back from Wife to the community.  Husband does not explain how the 2011 deed originated or how it became effective.  He cannot show error in the trial court's conclusion that the writings in evidence did not clearly and unambiguously establish an intent to change the characterization or ownership of the residence as separate property.  There is again no need to reach any issues of undue influence.

D.  Alternate Argument for Reimbursement

Finally, Husband argues that even if the trial court were correct in designating the residence to be Wife's separate property, there was still a basis in the evidence to grant

21

credits to the community for its presumed contributions of funds to reduce the principal of the loans on the residence, either as monetary reimbursement or as an percentage interest in the equitable ownership of the residence. (§ 2640; *In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1556-1557 (*Nelson*) [to apply a *Moore/Marsden* calculation to allow a community interest according to amounts the community expended, sufficient supporting evidence must be presented].)[10]

To show the existence of such community contributions toward the payments on the mortgage, Husband essentially argues that separate property funds must have been commingled with community funds, such as through the use of the Wells Fargo family account. Husband has not pointed to any proof he presented of community contributions toward paying down the mortgage, and instead he merely assumes there must have been some, apparently because his income varied widely and he admitted to earning significant amounts after 2010. As supporting evidence in the record, he points to a 2014 mortgage bill with both names on it, and estimates there should be a community property interest of nearly $75,000. Evidently, the premise of Husband's argument is that the residence qualified as part of the community estate to be divided, but that premise fails. He did not provide proof that he made contributions qualifying him for reimbursement under section 2640, subdivision (b), for his "contributions to the acquisition *of property of the*

---

[10]    Under *In re Marriage of Moore* (1980) 28 Cal.3d 366, 371-372, the community has a pro tanto community property interest in acquired property " 'in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds.' " (See *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 436-439.)

22

*community property estate* to the extent the party traces the contributions to a separate property source." (Italics added.)

Also, Wife argues that no such issue was raised at trial and it should be deemed forfeited. On appeal, the parties do not argue any effect of section 852, subdivision (d), and due to a failure of proof by Husband, we need not address its provisions, reading: "Nothing in this section affects the law governing characterization of property in which separate property and community property are commingled or otherwise combined."

Although it is not clear whether this issue was properly brought before the trial court, it is moot in light of our determination on the other issues presented. It is unnecessary to address any reimbursement issues. Sufficient evidence supports the trial court's findings that the residence was and is the separate property of Wife.

IV

*CONDITIONAL AWARD OF RACA*

The parties stipulated to the December 31, 2012 separation date for valuation of the business, and evidence was presented about RACA's proceeds. In its oral statement of decision on the RACA business, the court assigned a value of $47,681 as of the date of separation, and awarded it to Husband, conditioned on his making an equalizing payment to Wife of half that amount.

Husband contends the trial court erroneously failed to accept the valuation as estimated by the special master appointed by the court, Dennis Pearson. (Evid. Code, § 730 [court's appointed expert].) Pearson used the time rule and found that the value to the community of eligible real estate commissions was $25,627.78. The court examined

23

the evidence and the witnesses, and determined that there was a basis to allocate to the community an additional three commissions that were payable after the date of separation. Husband thus argues insufficient evidence supports the higher valuation the court assigned to the business.

A. Standard of Review and Valuation Methods

On a showing of good cause, the trial court may value a community asset at an alternate valuation date from the date of trial. (§ 2552, subds. (a), (b); *Nelson, supra*, 139 Cal.App.4th 1546, 1550.) "In this regard, the trial court has considerable discretion to divide community property in order to assure that an equitable settlement is reached. 'As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it.' " (*Ibid.*, citing *Duncan, supra*, 90 Cal.App.4th 617, 625; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 670 [discretionary valuation ruling affirmed so long as within the range of evidence presented].)

In determining the status of property as separate or community property, the court may apply an inception of title theory, which determines when equitable title becomes incipient, as well as the time in which title is extended and perfected. In some cases, ownership of an asset may not become complete until the original right "matures" into full title. (*Giacomazzi v. Rowe* (1952) 109 Cal.App.2d 498, 500; 11 Witkin, Summary of Cal. Law, *supra*, Community Property, § 7, p. 534; *In re Marriage of Joaquin* (1987) 193 Cal.App.3d 1529, 1533.) This "inception of title" theory is commonly applied to determine when property acquired before marriage retains a separate property character,

24

but Husband has not shown why it must be confined to that context. (*Ibid*.; see, e.g., *In re Marriage of Kilbourne* (1991) 232 Cal.App.3d 1518, 1526 [trial court could properly accept expert's value of a law practice by considering work in progress as of the date of separation].)

## B. Relevant Record; Analysis

At trial, Husband testified that the income from RACA was the product of work performed prior to receiving the income. The value of many waived commissions was discussed, according to Husband's practice of representing certain clients on that basis (such as the Plum property), to increase his professional visibility in the community. Real estate commissions paid in January and February were the result of work done in November and December. Certain listed properties, Del Cerro, Nipoma, and Locust, were signed up in December 2012 and closed in January and February.

In Pearson's report and testimony, he gave his valuation opinion based on RACA's closed listings, including waived commissions. He considered as the relevant dates: (1) listing, (2) closing of escrow, and (3) the percentage of time in the listing periods that occurred prior to December 31, 2012. He concluded that as of the date of separation, the community's commissions value was $25,627.78. Also, there were $8,160 in net tangible business assets, for a combined $33,787 community value.

The court treated the determination of the community business's value as a question of fact. (*Duncan, supra*, 90 Cal.App.4th at p. 631.) It considered the special master's report and inquired about the methods in it. Pearson responded that he utilized the time rule to arrive at the community commission value, and apportioned commissions

25

into two separate groups. He only included commissions he believed were earned prior to separation, for a $25,627 value. The court asked Pearson whether a fee is earned at the time the professional contract is signed, and compared valuation methods used in other contexts (bankruptcy). Pearson said he was not familiar with such an inception of rights theory, but he agreed with Wife's counsel that it would be possible to allocate the aggregate of commissions according to the time of listing, as opposed to the time of completion of payment.

In issuing its ruling, the court said it would be speculative to allocate all of the disputed waived commissions to the value of the business. Specifically as to the expert's straight line allocation of all listings and his omission of the value of those closing shortly after separation, the court disagreed with that method. Three such commissions had closed between 29 and 79 days after listing, and the court ruled they were essentially earned when signed up. The court made a finding that the value of those three commissions was part of the community property. However, the fourth waived commission (Plum), had been on the market longer and there was no evidence about when effort was put in to make that sale, and it was properly omitted. The court assigned a $47,681 value to RACA, and required Husband to buy Wife out by making a payment of half that.

The trial court was granted "considerable discretion to divide community property in order to assure that an equitable settlement is reached." (*Nelson*, *supra*, 139 Cal.App.4th 1546, 1550; *Duncan*, *supra*, 90 Cal.App.4th 617, 625.) Under that approach, the court had a substantial basis in the evidence to conclude that the three listings signed

26

before separation, but paid shortly thereafter, were earned when listed. The court had the discretion to question the expert's methods and to decide not to accept the expert's recommendation in full. (Evid. Code, § 730 [discretionary language, court "may" appoint expert to assist it]; *In re Conservatorship of McKeown* (1994) 25 Cal.App.4th 502, 509 [trier of fact may reject expert testimony]; 1 Witkin, Cal. Evidence (5th ed. 2012) Opinion Evidence, § 86, p. 728.) The decision placing a value on the community business had a legal basis and was within the range of the evidence presented. No abuse of discretion is apparent, and we affirm the judgment in full.

DISPOSITION

The judgment is affirmed. Costs on appeal are awarded to Wife.

HUFFMAN, Acting P. J.

WE CONCUR:

NARES, J.

PRAGER, J.[*]

---

[*]      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27