Filed 1/28/20; Certified for Publication 2/19/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of JEFFREY GRIMES and MINGMING MOU. | H046035 (Santa Clara County Super. Ct. No. 16FL174815) |
| JEFFREY GRIMES, Respondent, v. MINGMING MOU, Appellant. | |

In this dissolution of marriage action, appellant Mingming Mou appeals from an order characterizing marital property and awarding spousal support. Mou claims insufficient evidence supports the trial court's finding that certain money in Mou's brokerage account was a loan from Mou's relatives to the marital community. In addition, Mou contends the trial court abused its discretion by awarding permanent spousal support in an amount far below her needs based on the marital standard of living and for an unreasonably short period of time. For the reasons explained below, we affirm the trial court's order.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

Respondent Jeffrey Grimes and Mou married in January 2004 and separated in July 2015. Grimes filed a petition for dissolution of the marriage in April 2016.

On April 26 and May 10, 2018, the trial court held a hearing on reserved issues in the action, including property division and permanent spousal support requested by Mou. On May 24, 2018, the trial court entered its Findings and Order After Hearing on Spousal Support and Division of Scottrade Account.[1] Mou filed a notice of appeal of the May 24 order on July 23, 2018.[2]

On October 29, 2018, the trial court issued further Findings and Order After Hearing, appending to that order a document titled "Attachment 7 to Findings and Order After Hearing." In the attachment, the trial court ordered Mou to transfer half of the funds then in the brokerage account to Grimes and ordered Grimes to pay directly to Mou his one-half share of the debt owed to Mou's relatives on their loan to the marital community.

On January 23, 2019, the trial court entered an uncontested judgment of dissolution. The judgment incorporated and appended the May 24, 2018 order.[3]

---

[1] The appellate record indicates that the brokerage firm Scottrade was acquired by TD Ameritrade in late 2017. The account at issue here is referenced in the record variously as "the Scottrade account" and the "TD Ameritrade account." For clarity, we principally refer to the disputed account as the "brokerage account."

[2] There is no indication in the record that Mou obtained a certificate of probable cause for appeal from the trial court under Family Code section 2025 and California Rules of Court, rule 5.392.

[3] Mou did not appeal from either the October 29, 2018 order or the January 23, 2019 judgment.

B. *Evidence Presented at the Hearing*

At the hearing held on April 26 and May 10, 2018, that led to the order at issue in this appeal, the trial court heard testimony from Grimes, Mou, forensic accountant Reagan Wade, and vocational expert Richard Lyness.

Grimes and Mou lived in San Francisco for a few years after they married in 2004—first in a rental property and then in a condominium they purchased.[4] They had a child in November 2005. Around August 2008, the family moved into a rental property in Palo Alto. In November of that year, Grimes and Mou had their second child.[5]

In 2013, Grimes and Mou had talked about purchasing a home. According to Grimes, during their conversations Mou said her family was willing to give them money for the home purchase. Grimes testified that his "understanding, initially, was that [the money from Mou's relatives] was to be a gift."

In a December 2013 e-mail exchange, Grimes and Mou communicated about a $2 million potential bid on a particular home and the funds they could marshal for the purchase. Mou wrote that she "can always borrow some [money] from [her] brother to cover" a temporary shortfall in their bid due to Grimes's inability to sell certain stock until February 2014. Mou described in an e-mail the money that she had for purchasing the home as "my cash (400K at today's stock price, though $300K is from my brother but we can use it for a while)."

The money that Mou described as being "from [her] brother" had initially been deposited into Mou's account at Wells Fargo and then transferred into Mou's Scottrade brokerage account. Grimes testified that he did not know about the amounts or dates of

---

[4] Grimes and Mou ultimately sold the condominium for $1 million after their separation in 2015. Mou received $65,000 from that sale. As for other community property, Grimes estimated that he and Mou would each receive about $1 million from its division (excluding the brokerage account and Grimes's and Mou's retirement accounts).

[5] At the time of the issuance of the May 2018 order, Grimes and Mou were sharing joint legal and physical custody of the children.

these deposits and transfers when they were made.  In addition, Grimes said he did not know in 2013 about Mou's brokerage account, and Mou did not give him an IRS Form 1099 for her brokerage account when he prepared their jointly-filed 2013 tax return.  In 2015, the IRS notified Grimes and Mou of their failure to report on the brokerage account in their 2013 tax return.[6]  Grimes testified he first became aware that Mou had the brokerage account when he received the 2015 IRS notice.

In a March 2014 e-mail exchange regarding "Taxes/Gifts from foreign persons," Grimes told Mou, "Looks like we need to file [IRS] Form 3520 to avoid being penalized on any gifts received from foreign persons by April 15th."  Mou responded, "[T]hanks. [C]an you take care of that?  [W]hat do you need?"  Grimes said he "just need[ed] details to fill out the form."  Later, in an e-mail from Mou to Grimes regarding "info for tax filing," dated April 15, 2014, Mou listed four dates and dollar figures (totaling $299,936)[7] and wrote:  "those are not gifts, those are loans from my brother.  I'm not sure if you need to file differently."

Grimes testified that he and Mou filed joint tax returns for 2014 and 2015, and those returns included income from Mou's brokerage account.  He reiterated his belief that the $299,936 received from Mou's relatives "was originally intended as a gift or at worst an interest[-free] loan."[8]  Grimes claimed that Mou "recharacterized it as a loan"

---

[6] Although Grimes prepared an amended return for 2013 in response to the IRS notice, the IRS informed him it was unnecessary to submit it, so Grimes never filed an amended return.  Grimes also acknowledged that he did not "file a gift return" for the money received from Mou's relatives in 2013.

[7] Specifically, Mou listed the following dates and figures:  "4/08/13, from China $50,000.00  [¶]  4/03/13, from China $50,000.00  [¶]  5/16/13, check from beibei, $99,936.00 (maybe you don't have to file this one?)  [¶]  5/01/13, check from Zhuang Yuan, $100,000.00 (maybe you don't have to file this one?)."

[8] The reporter's transcript from the hearing states that Grimes referred to an "interest reloan."  We agree with Mou's contention that "interest reloan" appears to be a mis-transcription, and it is reasonable to conclude that Grimes actually said "interest-free loan."  Grimes does not challenge this interpretation.

4

over time, including in the December 2013 e-mail.  Grimes said that he and Mou did not enter into any agreement about how the money should be characterized.  In addition, Grimes explained that he did not exchange any documents concerning the money with Mou's relatives or otherwise discuss with them the money, its repayment, or payment of interest on it.  Mou's family did not attempt to join the dissolution action to claim the money.

Mou testified that the $299,936 in her brokerage account "was originally borrowed from her family members.  At the time it was borrowed, it was intended to be used to help [Mou and Grimes] as a loan for the down payment on a piece of property that they were looking to purchase."[9]  At the time the money was received, Mou discussed with Grimes "that this was money that they would be borrowing and that they would be responsible to repay the money."  "When the money was not used for the purchase of a home, [Mou] had deposited this money in a Scottrade account under her name solely, which she managed.  She offered to return the funds to her relatives and they asked her to continue to manage the money on their behalf.  [Mou's] understanding with her relatives was that she would be managing it for them and that gains or losses on that money would be for her relatives, not for her benefit."  The home Mou and Grimes intended to purchase would have been a community property home and the $299,936, had it been used to fund the purchase, would have been a community property debt.  After depositing the money from her relatives into the brokerage account, in 2013 Mou deposited approximately $40,000 belonging to the community into the account and, in 2014, an additional $33,000 of community funds.

In response to questioning by the trial court, Mou testified that when she and Grimes decided not to purchase a home, she told Grimes that she was going to return the

---

[9] Mou's counsel presented this testimony through an offer of proof and responses to questions posed by the trial court.  Mou subsequently adopted her counsel's statements.

5

$299,936 to her relatives. Mou stated that, in spring 2014, she made a verbal offer to her relatives to return the money, but they told her to keep the money and invest it on their behalf. Mou's relatives did not provide her written authorization to invest the money for them, and Mou did not discuss with her family how the taxes on the investment would be paid. Mou informed Grimes of her plan to invest her relatives' money around the time her relatives told her to do so, but Mou and Grimes did not discuss how any taxes would be paid. Mou's relatives were not able to open a brokerage account in the United States. Mou acknowledged that she was not a "registered broker/dealer or anything of that nature."

When asked on cross-examination if there were any letters sent by her relatives "indicating that [the money] was a gift or a loan," Mou answered, "Not letter. It's something like we just casually draft it [sic]." When asked further if there were "any documents that indicated that [her relatives] would get interest on their alleged money," Mou said, "It was -- Yeah. They were saying it's to be determined." Mou offered no documentary evidence to corroborate this portion of her testimony. None of her relatives testified at the hearing.

Mou withdrew $67,800 from the brokerage account after she and Grimes separated. According to the parties' joint forensic accountant Reagan Wade, as of March 31, 2017, the brokerage account included $91,177.60 in community funds and $340,217.03 in Mou's relatives' funds; that is, it was 21.14 percent community funds and 78.86 percent relatives' funds. Wade testified that she was unable to determine which specific funds in the brokerage account were used when securities had been purchased and sold. Thus, Wade used a pro-rata approach based on the total amount of community funds and relatives' funds in the brokerage account to apportion the funds as of March 31, 2017.[10] Wade testified that because Mou had deposited her relatives' money and

---

[10] Mou's counsel said Mou was willing to accept Wade's pro-rata allocation and argued that the percentages continued to be applicable at the time of the hearing in 2018,

community funds into the account, Wade could not accurately attribute the gains in the account to the different sources of capital.  Wade stated, "if [Mou] had wanted to maintain her relatives' securities as a whole, she could have and should have probably set up her own account without commingling."

During the marriage, the family enjoyed what Grimes described as a middle to upper-middle class lifestyle.  One child attended private school.  The family owned three cars: a Subaru Legacy station wagon purchased new in 2005, a 2002 Lexus purchased around 2008, and a 2012 Porsche 911 purchased in 2013.  The family went on vacation regularly during marriage, at a cost of around $5,000 annually.  They dined out about once per month, spending about $60 to $70 per meal.  At the time of their separation in July 2015, Grimes and Mou were renting a home in Palo Alto.  Grimes continued to pay the rent and utilities (a cost of about $5,000 to $5,300 per month) voluntarily for about a year after the separation.  Grimes estimated that he paid Mou around $250,000 to $300,000 in spousal support from July 2015 to May 2018.

In May 2018, Grimes was 43 years old and worked as an engineering manager at Google/YouTube.  He had been employed at Google/YouTube since November 2006.  Grimes earned a base salary of $230,00 per year in 2018, and received Google Stock Units (GSU), the most recent grant of which was worth approximately $200,000 and vested monthly over a four-year period.  In addition, Grimes was eligible for a discretionary bonus.  From 2011 through 2015, Grimes and Mou had a yearly total gross income of $316,260, $342,294, $447,639, $543,443, and $778,660, respectively.

In May 2018, Mou was 49 years old.  She immigrated from China in 1997 after having completed a bachelor's degree there.  Mou is fluent in Mandarin and English and obtained a master's degree in finance in 1999.  Thereafter, Mou worked at several companies as a treasury analyst, which is a "mid-level contributor professional position."

because there had been no change to the funds in the brokerage account other than gains and losses.

While working as a contractor for Gilead in 2013, 2014, and 2015, Mou earned $133,139, $132,390, and $88,468, respectively. Mou reported that in July 2015, her employment at Gilead ended because the company was unable to renew her contract. Grimes testified that in October 2015, Mou began working as a contractor at Spectraforce for a six-month term, but she quit that job within weeks. Mou told Grimes that she had to quit to prioritize certain expectations Grimes had presented to her regarding their children and other issues. Mou, however, testified that she did not leave her position at Spectraforce voluntarily. Instead, when Mou told her manager that she needed some time off and flexibility in her schedule, the manager said Mou was not a good fit for the position and "basically" fired her.

Until she left the Spectraforce position in October 2015, Mou had worked consistently throughout the marriage, only taking off for a few months on occasion to care for the children. In May 2016, the trial court ordered Mou to seek work. In addition, in early 2018, Mou agreed to having the trial court impute $90,000 of income to her for the purposes of determining temporary spousal and child support. In April 2018, Mou obtained contract employment as a "Treasury Services Consultant" at $48 per hour, which was her first paid employment since 2015.

Vocational expert Richard Lyness testified that Mou "may be at this point a little disadvantaged" in the job market due to her age and her absence from the workforce could be an added liability. Nevertheless, Mou presented as a "knowledgeable and pleasant professional," and the fact that she had two academic degrees and a consistent work history with recognizable and well-known companies was "certainly an asset." Lyness believed Mou was "readily employable and certainly capable of working toward becoming self-supporting." He described the job market in the area as "robust" and said "there are a range of available jobs that are appropriate to [Mou's] portfolio." Lyness had expected that Mou could have found new, appropriate employment within one year of the end of her employment in 2015. Lyness estimated Mou's current earnings capacity was

between $101,008 and $123,257.  Lyness said that it was unlikely Mou could advance in her career to a director-level position (which pays about $200,000 per year), but she may rise from a treasury analyst position to a treasury manager position.

C.  *The Trial Court's Ruling*

After hearing evidence and argument, the trial court issued its order on May 24, 2018.  The trial court concluded the $299,936 from Mou's relatives held in the brokerage account was a loan to the community.  The trial court observed that the lack of documentation about how funds in the brokerage account, which consisted of both community property and the funds from Mou's relatives, were invested meant that "[a]ny current attempt to 'track' particular purchases or returns to either funds from Ms. Mou's relatives or community funds appears to be based solely on conjecture or Ms. Mou's current recollection unsupported by any documentary evidence."  Further, all taxes on the interest, dividends, and capital gains/losses from the brokerage account were reported as income on Grimes and Mou's joint income tax returns.

The trial court rejected as unsupported by the evidence Grimes's primary contention that the funds from Mou's relatives were a gift to the community.  The trial court observed that Grimes and Mou did not treat the money as a gift for tax purposes.

The trial court equally did not credit Mou's contention that the money (although originally a loan to the community) had been returned to her family and she was investing it on their behalf.  There was no documentation evincing an "investment agreement" or supporting that Mou and her relatives had changed the character of the funds from a " 'loan' " to a " 'managed investment.' "  Mou was not a trained or licensed broker/dealer.  There was no record that Mou segregated her relatives' funds or would have been able to track the gains or losses from those funds.  The trial court found it "[s]ignificant[]" that "all gains and losses on these funds loaned to the community were treated as belonging to the Parties."  The trial court implicitly did not credit Mou's testimony to the contrary.

9

Based on the evidence, the trial court concluded that "the $299,936 was and is a loan to the community, made for a community purpose, and order[ed] that this debt obligation shall be equally divided between the Parties, with each Party to take possession of one-half of the principal amount of the loan and also assume as his/her separate liability the obligation to repay Ms. Mou's family the sum of $149,968, each." The trial court concluded further that the "remaining funds in the [brokerage account], including all earnings whether on the original community funds or the funds loaned to the community, are community property, and shall be divided equally between the Parties."

Regarding Mou's request for permanent spousal support, the trial court analyzed the evidence under the factors in Family Code section 4320.[11] The trial court found that Grimes and Mou enjoyed an upper middle-class standard of living during their 11 and one-half years of marriage. The trial court determined that Grimes was capable of maintaining the marital standard of living and did not dispute his ability to pay child and spousal support. The trial court also concluded that Mou was self-supporting. Nevertheless, the trial court found that Mou's current earnings, earning capacity, community property distributions, and separate property were not sufficient for her to maintain and retire with an upper middle-class standard of living.

The trial court found a current impairment of Mou's earning capacity due to the two-year gap in her employment beginning around when the parties separated in July 2015. That impairment, however, did not result from Mou's spending time on domestic duties. Further, prior to 2015, Mou worked consistently for approximately 15 years before and during the marriage, only taking time off from work for pregnancy disability or family leave in connection with child-bearing. Although Mou "took on greater responsibility for child-care, enabling [Grimes] to work the long hours required to achieve success as an engineering professional and manager," there was "no evidence

---

[11] Unspecified statutory references are to the Family Code.

10

that [Mou] contributed to [Grimes's] employment specifically at Google or his advancement within that particular company."

The trial court found that Mou had "benefitted from temporary spousal support throughout the marital dissolution process, which was at a higher level and for a greater duration than was warranted under the facts of this case." The trial court determined that Mou had not been involuntarily terminated from her position with Spectraforce in 2015; rather it was "more of a mutual separation." The trial court observed that it had issued a "seek work order" in May 2016, and had ordered in early 2018 the imputation of income to Mou in the amount of $90,000 per year—soon after which Mou resumed work at a rate of $96,000 per year. The trial court found that Mou's job-search efforts had not been "appropriately and fully focused," and if Mou had engaged in a good-faith job search, "she would have been employed within 12 months from commencing a diligent search, i.e. by August 1, 2016." Further, "because of her unemployment, Ms. Mou was not required to contribute to the financial support of the Parties' children, thus imposing a further burden on Mr. Grimes."

Upon consideration of the evidence and argument of the parties, the trial court ordered Grimes to pay Mou long-term spousal support as follows: (a) $3,000 per month in base spousal support from June 1, 2018, through December 31, 2019, plus 20 percent of any additional income earned by Grimes in excess of $300,000 per year in 2018 and 2019; (b) $2,000 per month from January 1, 2020, through December 31, 2021; and (c) $1.00 per month from January 1, 2022, through November 30, 2026. The trial court noted that December 31, 2019, was the "last day of the year in which GSU's granted prior to the marital date of separation will presumably vest."

In addition, the trial court defined "additional income" broadly to include "bonuses, commissions, stock grants, vested stock options, GSUs or other compensation from employment . . . received by [Grimes] on or before March 15, 2020 for work and services performed by [Grimes] prior to December 31, 2019, but [] not . . . regularly

11

scheduled vesting of previously issued stock options or GSUs." The trial court defined "additional income" in this manner "specifically to avoid a circumstance where the employer defers additional income from 2019 into 2020, causing a reduction in the spousal support that would otherwise be paid under this order."

The trial court directed that its order will remain in effect until "either party's death, [Mou's] remarriage, further court order, written agreement or November 30, 2026 (the last day of the month in which the Parties' youngest child turns 18)." In addition, the order may be modified as to the amount of support upon a showing of changed circumstances. The trial court's jurisdiction to award further support may also be extended for changed circumstances upon a motion filed by December 1, 2026.

## II. DISCUSSION

Mou raises two claims on appeal. Mou argues the trial court's ruling that the $299,936 received from Mou's relatives remained a marital community loan was not supported by substantial evidence and thus the trial court "should not have awarded [Grimes] a community property interest in the proceeds of the investment of those funds." In addition, Mou contends that the spousal support award amounts to an abuse of discretion because the award was "far below [Mou's] actual needs" based on the marital standard of living and was unreasonably short in duration.

Before we examine the merits of Mou's claims, we address the appealability of the trial court's ruling on the characterization of the brokerage account funds.

A. *Appealability of the Order Regarding the Brokerage Account*

"The existence of an appealable judgment is a jurisdictional prerequisite to an appeal." (*Doran v. Magan* (1999) 76 Cal.App.4th 1287, 1292 (*Doran*).) Hence, we must first decide whether the trial court's order characterizing and dividing the funds in the brokerage account is appealable.

Mou contends that the ruling, which was appealed before the judgment was entered, is appealable under the " 'collateral order doctrine.' " In the alternative, Mou

12

argues that if the ruling is not appealable, we should decide the merits of her claim in the interest of justice, because "[n]othing changed" regarding the disposition of the brokerage account funds between issuance of the order and the subsequent entry of judgment. Grimes counters that the trial court's order is not appealable and Mou's appeal of the trial court's interlocutory ruling should be dismissed.

"California is governed by the 'one final judgment' rule which provides 'interlocutory or interim orders are not appealable, but are only "reviewable on appeal" from the final judgment.' [Citation]  The rule was designed to prevent piecemeal dispositions and costly multiple appeals which burden the court and impede the judicial process." (*Doran*, *supra*, 76 Cal.App.4th at pp. 1292–1293.)  An "exception to the 'one final judgment' rule codified in Code of Civil Procedure section 904.1 is the so-called collateral order doctrine.  Where the trial court's ruling on a collateral issue 'is substantially the same as a final judgment in an independent proceeding' [citation], in that it leaves the court no further action to take on 'a matter which . . . is severable from the general subject of the litigation' [citation], an appeal will lie from that collateral order even though other matters in the case remain to be determined." (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 561.)

We agree with Grimes that the trial court's ruling on the brokerage account is not an appealable order under the collateral order doctrine.[12]  The collateral order doctrine does not apply here because the trial court's ruling on the brokerage account was not collateral to or "truly 'distinct and severable from the general subject of the litigation.' " (*Muller v. Fresno Community Hospital & Medical Center* (2009) 172 Cal.App.4th 887, 904.)  Instead, the trial court's ruling was a necessary step to the ultimate division of the parties' entire marital estate.  (See *In re Marriage of Lafkas* (2007) 153 Cal.App.4th 1429, 1433 (*Lafkas*).)

---

[12] By contrast, the spousal support portion of the trial court's order is appealable by operation of statute.  (Code Civ. Proc., § 904.1,  subd. (a)(10); § 3554.)

In addition, the trial court's ruling contemplated further action by the parties to divide the funds in the brokerage account. For example, it was uncontested that Mou had improperly withdrawn $67,800 in community funds from the account after the separation, and the parties needed to calculate the amount of money by which the balance would have increased had Mou not made this withdrawal. The trial court's ruling thus was not immediately operative and did not direct immediate division or payment of funds in the account. (See *Lafkas*, 153 Cal.App.4th at pp. 1433, 1435; cf. *In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119 ["direct appeal lies from a pendente lite attorney fees order where nothing remains for judicial determination except the issue of compliance or noncompliance with its terms"]; *In re Marriage of Skelley* (1976) 18 Cal.3d 365, 369 [finding an order for support appealable as "operative from the moment of pronouncement"].) Accordingly, the trial court's ruling regarding the funds in the brokerage account in the May 24, 2018 order is not appealable.

Although Mou's notice of appeal of the brokerage account ruling was prematurely filed, we next consider whether we should nevertheless exercise our discretion and address the merits of Mou's claim. Eight months after the trial court issued its ruling, the trial court entered a judgment of dissolution that ordered a final division of the marital property. As Grimes acknowledges, "a final judgment has been entered so there is no risk of piecemeal disposition or multiple appeals."[13] Grimes further recognizes that, as an exercise of our discretion, we may treat a premature appeal as a petition for an extraordinary writ. Although we decline to exercise our discretion to deem Mou's appeal to be a writ petition, we do not dismiss Mou's appeal of the ruling on the brokerage account funds.

---

[13] Grimes also concedes that Mou should not be found to have waived her right to appeal from the "uncontested" judgment here, because "[t]here is no indication that she consented to the [May 24, 2018] Order" when she "consented to the entry of a judgment in conformity with the Order."

14

We have authority to treat Mou's notice of appeal as if it had been timely filed. "The reviewing court may treat a notice of appeal filed after the superior court has announced its intended ruling, but before it has rendered judgment, as filed immediately after entry of judgment." (Cal. Rules of Court, rule 8.104(d)(2).) The circumstances of this case provide suitable reasons for us to address Mou's appellate challenge to the trial court's ruling. "[T]here is a well recognized policy in favor of resolving appeals on their merits [citations] and, generally, little by way of 'good cause' has been required in the decisions applying rule 2(c) [of the California Rules of Court]."[14] (*American Motorists Ins. Co. v. Cowan* (1982) 127 Cal.App.3d 875, 882.) In the present case, Mou had the right to appeal from the January 2019 judgment that ultimately divided the marital estate, and she could have challenged the trial court's ruling on the brokerage account in an appeal from the judgment. (See *Lafkas*, *supra*, 153 Cal.App.4th at p. 1433; *In re Marriage of Doherty* (2002) 103 Cal.App.4th 895, 898.) Mou's appeal does not implicate the trial court's additional order issued on October 29, 2018, after she filed her notice of appeal but before the entry of judgment. Further, Grimes does not assert any prejudice resulting from Mou's premature appeal. Under these circumstances, we will exercise our discretion to deem Mou's appeal of the trial court's ruling on the brokerage account funds as having been taken from the subsequent judgment entered in January 2019. (See *Rodriguez v. City of Santa Cruz* (2014) 227 Cal.App.4th 1443, 1450; *American Motorists*, *supra*, 127 Cal.App.3d at p. 883.)

---

[14] At the time *American Motorists* was decided, rule 2(c) of the California Rules of Court was the rule relevant to the timeliness of an appeal. That rule vested the appellate court with the authority to excuse a premature notice of appeal "in the discretion of the reviewing court for good cause." (*American Motorists*, *supra*, 127 Cal.App.3d at p. 882, fn. 2.) Rule 8.104(d)(2) sets out the current court rule governing a premature notice of appeal. (Cal. Rules of Court, rule 8.104(d)(2).)

B. *Sufficiency of the Evidence Regarding the Brokerage Account Funds*

Mou claims that the evidence does not support the trial court's ruling that the $299,936 she received from her relatives was and continued to be an interest-free loan to the marital community. Mou asserts that after she and her relatives agreed that she would invest the funds for them, the money "ceased to be a 'loan' " and, "[i]n effect, it became a trust, in which she held and invested the funds for her relatives' benefit." Mou argues that "there was no substantial evidence to support any ruling contrary to [Mou's] explanation" and her testimony was "the only testimony explaining why the funds had never been repaid, and was the only reasonable explanation." (Italics and boldface omitted.) Mou claims that, in consequence, the gains that resulted from investing the $299,936 are the property of her relatives, not the marital community.

We begin our analysis mindful that an "order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) Further, " ' "[t]he finding of a trial court that property is either separate or community in character is binding and conclusive on the appellate court if it is supported by sufficient evidence, or if it is based on conflicting evidence or upon evidence that is subject to different inferences . . . ." ' " (*Estate of Leslie* (1984) 37 Cal.3d 186, 201.) In reviewing the sufficiency of the evidence, " '[t]he power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the trial court's findings. [Citations.] 'We must therefore view the evidence in the light most favorable to the prevailing party, giving [that party] the benefit of every reasonable inference and resolving all conflicts in [that party's] favor . . . .' " (*Ibid*.) "All issues of credibility are [] within the province of the trier of fact." (*Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 925; see also *Karas v. Karas* (1951) 107 Cal.App.2d 135, 138.) However, "[s]ubstantial evidence is not any

16

evidence—it must be reasonable in nature, credible, and of solid value." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 51.)

Examining the entire record, we conclude that substantial evidence supports the trial court's finding that "the $299,936 was and is a loan to the community, made for a community purpose." The testimony of the parties establishes that the funds from Mou's relatives were a community debt. Mou admitted that she borrowed the money intending that it would be a community property debt and would be used to purchase a home as community property. Further, Mou's e-mail to Grimes in April 2014, titled "info for tax filing," stated that the $299,936 was a loan from her brother. Grimes, too, acknowledged his belief that the money was "at worst" an interest-free loan. Thus, the evidence supports the trial court's finding that the $299,936 in Mou's brokerage account was a debt for which the community estate was liable. In addition, the trial court's finding accords with section 910, which provides: "Except as otherwise expressly provided by statute, the community estate is liable for a debt incurred by either spouse before or during marriage, regardless of which spouse has the management and control of the property and regardless of whether one or both spouses are parties to the debt or to a judgment for the debt." (§ 910, subd. (a).) Moreover, "[l]oan proceeds acquired during marriage are presumptively community property." (*In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1187.)

Mou contends that the "only evidence" about how Mou's relatives "agreed to treat the funds they had transferred to" Mou came from her testimony. However, Mou ignores that the trial court had before it evidence other than Mou's testimony in the form of information about contemporaneous behavior by Mou and Grimes. The trial court noted that Mou did not segregate the $299,936 from other funds in her brokerage account and would not have been able to separately track gains and losses for the relatives' money. The parties' joint forensic accountant testified that "if [Mou] had wanted to maintain her relatives' securities as a whole, she could have and should have probably set up her own

17

account without commingling." In addition, the trial court found it significant that Mou and Grimes treated all of the money in the brokerage account as their own. Mou's claim that she and her relatives agreed to recharacterize the funds and have Mou invest the money on their behalf lacked any documentary support, even as Mou asserted (without substantiating the claim in any way) that there was written evidence to that effect.

The issue of Mou's credibility was a matter for the trial court to resolve, not this court. "[S]o long as the trier of fact does not act arbitrarily and has a rational ground for doing so, it may reject the testimony of a witness even though the witness is uncontradicted. [Citations.] Consequently, the testimony of a witness which has been rejected by the trier of fact cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204.) That Mou commingled the funds she received from her relatives with community property before and after the purported investment agreement and reported the income and losses on the parties' jointly-filed tax returns is evidence of solid value upon which the trial court could properly reject Mou's assertion that the character of the funds changed when the couple elected not to purchase a house. Further, under questioning from the trial court, Mou demonstrated some uncertainty about the timing of her purported offer to return the loan proceeds to her relatives and their direction to invest the money. Mou also testified that she told Grimes about offering to return the money and investing it from her brokerage account. But Mou's testimony in this regard conflicted with Grimes's testimony that he lacked knowledge of the funds in the brokerage account until 2015.

On the present record, we may not disregard as arbitrary or irrational the trial court's rejection of Mou's testimony about the characterization of the money in the brokerage account. Similarly, we determine that the trial court could reasonably infer from the manner in which the parties treated the $299,936 from the time the money was

18

received through separation that it remained a loan to the community and the investment income therefrom was community property to be divided equally between the parties. In addition, the trial court's finding accords with the statutorily-based "premise that all property acquired during the marriage is community property." (*In re Marriage of Benson* (2005) 36 Cal.4th 1096, 1103.) For these reasons, we conclude that substantial evidence supports the trial court's characterization of the $299,936 as a loan to the community and division of the earnings from the loan proceeds equally as community property.

### C. *Permanent Spousal Support*

Mou claims that the trial court abused its discretion when it awarded her permanent spousal support, because "a mere $2,000 per month . . . for the two years beginning January 1, 2020, is so far below her actual needs based on the standard of living she enjoyed during the long-term marriage," and "a mere three-and-a-half years [of spousal support] after the 11.5-year marriage" is unreasonably brief. (Fn. omitted.) Mou asserts specifically that the trial court's failure to "specify what income [Mou] would actually need to maintain the marital standard of living, or whether the support as ordered would enable her to maintain the marital standard of living" "suggests the court's determination of the amount and duration of support was so arbitrary as to require reversal under the applicable abuse of discretion standard."

Section 4320 sets forth the circumstances courts must consider in ordering spousal support.[15] " 'An award of spousal support is a determination to be made by the trial court

---

[15] The version of section 4320 in effect at the time of the trial court's order stated in full: "In ordering spousal support under this part, the court shall consider all of the following circumstances: [¶] (a) The extent to which the earning capacity of each party is sufficient to maintain the standard of living established during the marriage, taking into account all of the following: [¶] (1) The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment. [¶] (2)

19

in each case before it, based upon the facts and equities of that case, after weighing each of the circumstances and applicable statutory guidelines. [Citation.] In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it. "The issue of spousal support,

---

The extent to which the supported party's present or future earning capacity is impaired by periods of unemployment that were incurred during the marriage to permit the supported party to devote time to domestic duties. [¶] (b) The extent to which the supported party contributed to the attainment of an education, training, a career position, or a license by the supporting party. [¶] (c) The ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living. [¶] (d) The needs of each party based on the standard of living established during the marriage. [¶] (e) The obligations and assets, including the separate property, of each party. [¶] (f) The duration of the marriage. [¶] (g) The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party. [¶] (h) The age and health of the parties. [¶] (i) Documented evidence, including a plea of nolo contendere, of any history of domestic violence, as defined in Section 6211, between the parties or perpetrated by either party against either party's child, including, but not limited to, consideration of emotional distress resulting from domestic violence perpetrated against the supported party by the supporting party, and consideration of any history of violence against the supporting party by the supported party. [¶] (j) The immediate and specific tax consequences to each party. [¶] (k) The balance of the hardships to each party. [¶] (*l*) The goal that the supported party shall be self-supporting within a reasonable period of time. Except in the case of a marriage of long duration as described in Section 4336, a 'reasonable period of time' for purposes of this section generally shall be one-half the length of the marriage. However, nothing in this section is intended to limit the court's discretion to order support for a greater or lesser length of time, based on any of the other factors listed in this section, Section 4336, and the circumstances of the parties. [¶] (m) The criminal conviction of an abusive spouse shall be considered in making a reduction or elimination of a spousal support award in accordance with Section 4324.5 or 4325. [¶] (n) Any other factors the court determines are just and equitable." (Former § 4320, amended by Stats. 2015, ch. 137 (Sen. Bill No. 28), § 1.)

The current version of section includes a modified subdivision (i) that, based on the record here, appears inconsequential to the trial court's finding under the prior version that there was no evidence of domestic violence. (See § 4320, subd. (i), amended by Stats. 2018, ch. 938 (Assem. Bill No. 929), § 1.)

20

including its purpose, is one which is truly personal to the parties." [Citation.] In awarding spousal support, the court must consider the mandatory guidelines of section 4320. Once the court does so, the ultimate decision as to amount and duration of spousal support rests within its broad discretion and will not be reversed on appeal absent an abuse of that discretion. [Citation.] "Because trial courts have such broad discretion, appellate courts must act with cautious judicial restraint in reviewing these orders." ' " (*In re Marriage of McLain* (2017) 7 Cal.App.5th 262, 269.) An abuse of discretion occurs " 'when it can be said that no judge reasonably could have made the same order.' " (*In re Marriage of Meegan* (1992) 11 Cal.App.4th 156, 161 (*Meegan*).)

Mou contends that the trial court's failure to specify the income Mou needed to maintain an upper-middle class standard of living evinces arbitrariness in its spousal support determination. However, Mou's argument rests on an incorrect premise—that the trial court was obligated to award spousal support in an amount that would have supported Mou at the marital standard of living.

The marital standard of living is "a general description of the station in life the parties had achieved by the date of separation," rather than a "mathematical standard." (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 491 (*Smith*).) Furthermore, "[s]ection 4330 does not make 'marital standard of living' the absolute measure of reasonable need. 'Marital standard of living' is merely a threshold or reference point against which all of the statutory factors may be weighed. [Citation.] It is neither a floor nor a ceiling for a spousal support award." (*In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1560 (*Nelson*).)

While "the marital standard of living is an important factor in determining spousal support, it is not the only factor, and its importance in determining whether it is 'just and reasonable' (§ 4330) to award spousal support will vary based on the court's evaluation of the section 4320 factors." (*In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1247.) After considering the marital standard of living along with the other

21

statutory factors, "the court may 'fix spousal support at an amount greater than, equal to or less than what the supported spouse may require to maintain the marital standard of living, in order to achieve a just and reasonable result under the facts and circumstances of the case.' " (*In re Marriage of Williamson* (2014) 226 Cal.App.4th 1303, 1316.)

California law has long rejected the position argued by Mou—that if Grimes could have afforded to pay spousal support in an amount that would have allowed Mou to maintain the marital standard of living enjoyed by the couple prior to dissolution, then the trial court abused its discretion in not so doing. In *Smith*, the Court of Appeal refused to adopt the standard proposed by the appellant there that " '[i]f the supporting spouse has returned to the pre-dissolution standard of living, and can also afford to pay support at that level, that is the order which must be made.' " (*Smith*, *supra*, 225 Cal.App.3d at p. 483, italics omitted.) The court "reject[ed] this use of only one factor in [the spousal support statute], to the exclusion of all others." (*Ibid.*)

Instead, "permanent spousal support is supposed to reflect a complex variety of factors established by statute and legislatively committed to the trial judge's discretion, including several factors which tend to favor reduced support [when compared to temporary support], such as the 'goal' that the supported spouse should become self-supporting within a reasonable period of time." (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 525; § 4320, subd. (*l*).) "While spouses must support each other during marriage [citation], the court has been given greater discretion in marital dissolutions to deny spousal support altogether or to limit such support in an amount and duration that reflects the ability of both parties in contemporary unions to provide for their own needs." (*In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39, 52.) "The law has thus progressed from a rule that entitled some women to lifelong alimony as a condition of the marital contract of support to one that entitles either spouse to postdissolution support for only so long as necessary to become self-supporting." (*Id*. at p. 53.)

For these reasons, the trial court was not required in its support order to specify an amount of income Mou needed to maintain the marital standard of living and its failure to do so is not evidence of arbitrariness. To the contrary, the trial court properly considered and weighed the upper-middle class marital standard of living with the other factors in section 4320, acknowledging that Mou's "earnings and distributions are not sufficient to enable her to maintain an upper middle class standard of living in Silicon Valley . . . , as well as save enough to allow her to retire at the marital standard of living." We discern no abuse of discretion (or suggestion thereof) in the trial court's failure to associate a specific income with the marital standard of living and affixing Mou's spousal support to that amount. (See *Nelson*, *supra*, 139 Cal.App.4th at p. 1560; see also *Smith*, *supra*, 225 Cal.App.3d at p. 491.)

Having clarified the relevance of the marital standard of living to the overall determination of spousal support under section 4320, we examine what remains of Mou's claim of error. Mou does not contend that any of the trial court's findings with regard to spousal support were erroneous or otherwise not supported by the evidence. Mou acknowledges that she was found by the trial court to be "self-supporting." However, she disputes the amounts ordered by the trial court and the time over which Grimes was ordered to pay support. We regard Mou's arguments, in the main, as urging us to substitute our judgment for that of the trial court as to the amount and duration of the support. The record, however, does not provide us adequate reason to override the trial court's broad discretion in awarding spousal support or conclude that " 'no judge reasonably could have made the same order.' " (See *Meegan*, *supra*, 11 Cal.App.4th at p. 161.)

In its findings and order, the trial court listed all of the factors under section 4320 and stated its findings for each. The trial court considered, among other criteria, the parties' employment and earning histories, earning capacities, assets, obligations, and standard of living in Silicon Valley, as well as the length of the marriage. The trial court

23

also found that Mou's "efforts [to find a job] were not appropriately and fully focused." Only after the trial court imputed income to Mou did she "resume work at a rate of $96,000, almost $40,000 per year less than her last full year's rate of pay, and just slightly above the imputed earnings rate." In addition, the trial court concluded "there is no reason, other than further time on the job or years of experience, that should prevent Ms. Mou from obtaining employment as a Treasury Analyst IV"—a higher-paying position with a potential salary commensurate with that Mou had earned when working at Gilead several years earlier. These findings provide sufficient rationale for the amount and duration of the award here. Further, the record contains substantial evidence supporting the trial court's conclusions.

## III. DISPOSITION

The trial court's May 24, 2018 order is affirmed. Respondent is awarded costs on appeal.

_____
Danner, J.

WE CONCUR:


_____
Elia, Acting P.J.




_____
Grover, J.






**H046035**
*Grimes v. Mou*

Filed 2/19/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of JEFFREY GRIMES and MINGMING MOU. | H046035<br>(Santa Clara County<br>Super. Ct. No. 16FL174815) |
| JEFFREY GRIMES,<br><br>     Respondent,<br><br>     v.<br><br>MINGMING MOU,<br><br>     Appellant. | |

BY THE COURT:

The opinion in this case filed January 28, 2020, was not certified for publication. After the court's review of a request under California Rules of Court, rule 8.1120(a), and it appearing that the opinion meets the standards for publication under California Rules of Court, rule 8.1105, it is therefore ordered that the opinion be published in the Official Reports.

_____

Danner, J.


_____

Elia, Acting P.J.


_____

Grover, J.

| Trial Court: | Santa Clara County Superior Court |
| | Superior Court No. 16FL174815 |
| Trial Judge: | Hon. Roberta Hayashi |
| Counsel for Appellant | Adam R. Bernstein |
| Mingming Mou: | Law Offices of Adam Richard Bernstein |
| Counsel for Respondent | Christopher C. Melcher |
| Jeffrey Grimes: | Walzer Melcher LLP |

**H046035**
*Grimes v. Mou*