Filed 9/8/25  Marriage of Halle CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re Marriage of LISA BAZIAK and BRIAN HALLE. | |
| LISA BAZIAK HALLE, Respondent, v. BRIAN HALLE, Appellant. | G064021 (Super. Ct. No. 19D007004) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Julie A. Palafox, Judge. Affirmed.

Law Offices of Saylin & Swisher, Brian G. Saylin, and Lindsay L. Swisher, for Appellant.

Dawn E. Wardlaw, for Respondent.

Brian Halle appeals from a judgment of the family court awarding permanent spousal support, retroactive temporary spousal support, and attorney fees to Lisa Baziak Halle.[1] Brian challenges the family court's consideration of, or lack thereof, the factors set forth in Family Code section 4320 for awarding spousal support.[2] As discussed below, we find no error. Brian also challenges the family court's reliance on a computer program when awarding retroactive temporary spousal support, rather than conducting a full section 4320 analysis. As discussed below, the family court did not abuse its discretion in relying on the computer program. Finally, Brian argues the family court abused its discretion in awarding attorney fees to Lisa pursuant to sections 2030 and 2032. We conclude the award of attorney fees complied with the statutory requirements. Accordingly, we affirm.

STATEMENT OF THE CASE

I.

DISSOLUTION PETITION AND PARTIAL JUDGMENT

On August 28, 2019, Lisa filed a petition to dissolve her 27-year marriage to Brian. On September 23, 2019, Lisa filed a Request for Order (RFO) requesting orders for temporary support and attorney fees. On March 9, 2020, Brian stipulated to an order to pay Lisa temporary spousal support

---

[1] As is customary in family law cases, we will refer to the parties by their given names for purposes of clarity. (See *In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1549, fn. 1; *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1.)

[2] All further statutory references are to the Family Code, unless stated otherwise.

in the amount of $3,461 per month. That amount was calculated using a computer program.

On December 21, 2021, the dissolution petition was granted, and marital status terminated. On September 13, 2023, a partial judgment was entered resolving issues relating to the parties' real property, retirement accounts, life insurance policies, vehicles, financial assets, and separate property. The judgment reserved permanent spousal support, retroactive temporary spousal support, and attorney fees for trial.

On January 16, 2024, a bench trial commenced on the reserved issues.

## II.

### BRIAN'S TRIAL EVIDENCE

Brian testified he has a Bachelor of Science in Marketing, a Master of Business Administration and a Juris Doctorate. At the time of trial, he was 58 years old and healthy. During the marriage, he worked in banking. He worked for four banks before cofounding Pacific Enterprise Bank (PEB), a commercial bank, in 2007. Brian was President, and later President and Chief Financial Officer (CFO), of PEB until he left just before its merger with BayCom in February 2022. He recruited all of PEB's directors and many of its shareholders.

After leaving PEB, Brian traveled extensively, both in the United States and internationally in 2022 and 2023. Brian has written 12 books, six within the last two years. He self-publishes the books and sells them on Amazon, but has not made any money on the books. He spends six to eight hours a day writing books.

When he left PEB in February 2022, Brian signed a one-year non-solicitation agreement, which prevented him from soliciting customers,

3

employees, shareholders, or board members of PEB. The agreement did not bar Brian from working for another bank or forming a new bank. At the time of trial, he had spoken with a few headhunters, but had not received an interview with any bank. He tried to form a new bank, but could not find investors. After the non-solicitation agreement expired, Brian reached out to two investment groups about starting a new bank. However, neither group could raise the money. At the time of trial, he was unemployed, but optimistic he would be working again.

Brian recalled that other former senior PEB executives also signed the non-solicitation agreement, including Jerro Otsuki, PEB's CFO, and Russell Smith, the Chief Credit Officer. Shortly after February 1, 2022, Otsuki began working as the CFO for a small bank. Smith also went to work for a bank within the one-year non-solicitation period.

In 2019, Brian had a yearly salary of around $425,000. In 2020, his annual salary increased to $450,000, and in 2021, it was $465,000. He also received restricted stock units and money bonuses. In 2021, he received a bonus of $186,000. When he resigned from PEB in 2022, he received a lump sum of $883,500, consisting of a change of control payment and a bonus for prior work.

In 2023, Brian had interest and dividend income of $13,000 per month, and investment income of $9,000. Brian also had $2,500,000 in stocks, bonds, and other assets. He met his monthly needs. He paid Lisa $4,841 per month, consisting of $3,641 in spousal support and approximately $1,200 for her health insurance. He paid $142,055 in attorney fees during the proceedings. Initially, he paid the fees from his salary, and after he stopped working, he paid from his savings and a home equity line of credit.

## III.

### LISA'S TRIAL EVIDENCE

Lisa testified she is an attorney. While they were married, in 1994, she worked at her father's law firm. She worked full time until their first child was born in 1996. She gradually reduced her work schedule from three days to one day a week, as their second and third children were born in 1999 and 2002, respectively. She maintained this schedule until 2008, when their third child was in first grade. Then, she began working two days a week. Beginning in 2018 or 2019, she returned to working full time.

During the marriage, the family traveled extensively. They traveled to 25 different countries, went skiing almost every year, and went to Hawaii most years. They also had a housekeeper four days a week. In January 2001, the family moved into a 5,000 square feet house in Santa Ana, worth around $2 million. Lisa testified she kept the house during the property division although it needed repairs because the mortgage was low ($2,852 monthly) and she had lived and raised their three children there for 20 years.

Lisa's salary from her law firm job was $12,484 per month, and she received no bonuses. She received $9,000 monthly from an investment. She paid $1,700 per month for health insurance for herself and their daughter. Brian paid her approximately $1,200 for the health insurance and their daughter paid her portion.

In 2022, Lisa received $14,475 in interest income, which she believed was from stocks. However, she sold some stocks and received about $670,000. She paid Brian $640,000 as part of the division of property, and the rest was sent to her attorney's trust account. Based on that same selling price, she had $300,000 in remaining stocks. She has no retirement plan.

Lisa's actual monthly expenses were $24,870. This included $2,400 monthly for average maintenance of the house. In her Income and Expense Declaration prepared for the trial, she proposed to increase the maintenance and repair expenses of the home to $4,100 monthly, based on "significant deferred required maintenance." She paid $125,068 in attorney fees during the proceedings, which necessitated borrowing $10,000 from her parents last year.

IV.

FAMILY COURT'S RULINGS

Following trial, the family court ruled on the reserved issues. As to permanent spousal support, the court determined the marital standard of living (MSOL) was $100,000 monthly, or $50,000 monthly for each party. This number was based on the parties' annual income over the last three years of marriage. The court then examined the 14 factors identified in section 4320, focusing on those factors most relevant to the parties. As relevant to the issues on appeal, Lisa requested proposed monthly needs of $36,670 so she could maintain the MSOL. The increased needs are mainly due to required repairs and renovations for the house, including for a new heater, and to repair pool tiles, driveway cracks, and plumbing issues due to a slab leak. The length of the marriage was 27 years, 9 months, and both parties are in their late 50s and in good health.

The court found that neither Brian nor Lisa can live at the MSOL under the circumstances. "There appear to be two reasons for this. The first reason is because the MSOL was greatly inflated by stock awards and generous bonuses from Brian's banking career at PEB which is now over. The second reason is because Brian has chosen not to seek any more work in the banking industry despite having stellar qualifications. Instead, Brian has

6

chosen to enjoy the fruits of his labor (i.e., his stock awards) and the 'golden parachute' he received following his bank's merger more than two years ago." The court concluded "the record clearly demonstrates Brian can work, Brian has specialized marketable skills, Brian is not at retirement age, and Brian has failed to pursue reasonable opportunities to work for more than two years for personal reasons. Under these circumstances, the Court can either impute income based on Brian's past earning capacity or consider his unearned income and assets for support." The court declined to impute income due to its difficulty "given the various income components in Brian's compensation package and the wild variations over the years, coupled with the lack of any vocational evidence of opportunities."

Instead, the court elected to consider Brian's ability to pay spousal support using his unearned income and substantial assets. It noted that based on his current unearned income, Brian was meeting his monthly needs, which included paying Lisa almost $5,000 monthly. "Thus, Brian can continue to pay Lisa $5,000 per month in spousal support, while he remains unemployed. Since this is well below the MSOL, it is a just and reasonable [amount] based on the current circumstances. If Brian has additional needs, he can use his personal assets or make a sincere effort to return to work in the banking industry."

As to retroactive temporary spousal support, the court rejected Brian's request that it forego the guideline and consider the section 4320 factors in recalculating the spousal support. "While the Court agrees there is nothing that prevents it from considering the [section] 4320 factors in setting temporary support, the use of a standardized guideline is not only proper but has long been encouraged for temporary support. *Marriage of Ols[o]n* (1993)

14 Cal.App.4th 1, 5. Brian also failed to offer any compelling reason to depart from the guideline."

It then examined seven time periods and ruled on retroactive support as follows: Period 1 (September 23, 2019 - February 28, 2020): Lisa waived retroactive spousal support for this period. Period 2 (March 1, 2020 - July 31, 2020): The court adopted Lisa's guideline for spousal support, but found Brian overpaid support. Period 3 (August 1, 2020 - December 31, 2020): The court adopted Lisa's proposed guideline over Brian's proposed guideline because Lisa used the relevant tax year. It set spousal support at $4,050. Periods 4 and 5 (January 1, 2021 through December 31, 2022): The court reserved spousal support findings until additional evidence is submitted. Period 6 (January 1, 2023 - July 31, 2023): The parties disagreed about their respective incomes, but the difference was only $400. The court split the difference in the interest of justice, and set spousal support at $6,568. Period 7 (August 1, 2023 - current): Brian was unemployed and his severance stopped as of August 1, leading to a reduction in his income. The court, however, declined to reduce his spousal support obligation. It explained: "Having already determined Brian has sufficient income to pay support and was intentionally unemployed during this time, the court finds it is just and reasonable to keep the current support order ($3,641 per month) for this period."

Finally, the family court examined Lisa's request that Brian pay for one-third of her attorney fees pursuant to sections 2030 and 2032. The court first noted that each party paid similar amounts of attorney fees from similar income sources. It found that while the parties are currently similarly situated, "historically Brian earned as much as five to ten times more than what Lisa earned during the [27]-year marriage. Also, the parties' current

8

monthly incomes are similar only because Brian is currently unemployed while Lisa is working full time at her maximum capacity. At this point, Brian's unemployment two years after the merger is no longer reasonable and qualifies as purposeful under-employment. [¶] In addition to the true income disparity between the parties, Brian also has significantly more assets than Lisa after the marital estate was divided." "Given the clear disparity and having thoughtfully considered the [section] 4320 factors, Lisa's request for a one-third contribution is not only just and reasonable, Brian also has the readily available assets to contribute one-third toward Lisa's attorney fees."

DISCUSSION

I.

PERMANENT SPOUSAL SUPPORT

"'In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it." [Citation.] In balancing the applicable statutory factors, the trial court has discretion to determine the appropriate weight to accord to each. [Citation.] But the 'court may not be arbitrary; it must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth in [the statute], especially, reasonable needs and their financial abilities.' [Citation.] Furthermore, the court does not have discretion to ignore any relevant circumstance enumerated in the statute. To the contrary, the trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support. [Citations.] Failure to do so is reversible error.'" (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 304.)

9

"A spousal support order is reviewed for an abuse of discretion. . . . We must "'uphold a ruling which a reasonable judge might have made, even though we would not have ruled the same and a contrary ruling would also be sustainable. We cannot substitute our own judgment.'"" (*In re Marriage of Alan Freeman* (2025) 110 Cal.App.5th 406, 412.)

Brian argues the family court abused its discretion in rendering spousal support orders based on its finding of his earning capacity for which there is no substantial evidence. Specifically, "[t]here was no evidence as to what [he] could earn." Brian's earning capacity was discussed as part of the family court's analysis of section 4320 which encompasses "[t]he ability of the supporting party to pay spousal support, taking into account the supporting party's earning capacity, earned and unearned income, assets, and standard of living." (§ 4320, subd. (c).) The family court concluded that Brian's earning capacity exceeded his current earned income ($0) because he was intentionally unemployed. The court, however, did not find Brian had the ability to pay spousal support based on any specific earning capacity due to difficulty in calculating his past earning capacity and lack of evidence of specific current opportunities. Rather, it relied on Brian's "unearned income" and "assets," as permitted under section 4320, subdivision (c), to determine Brian had the ability to pay spousal support. At trial, Brian testified about his unearned income and assets, which constituted substantial evidence supporting the court's findings on those facts. In sum, the spousal support order was not based on how much Brian could earn. Accordingly, Brian has not shown an abuse of discretion.

Brian further argues the family court abused its discretion in failing to consider Lisa's financially imprudent insistence in living in the family residence, which required extensive repairs, rather than selling it and

10

living in a smaller residence that would not require extensive repairs. Brian's argument is based on *In re Marriage of McElwee* (1988) 197 Cal.App.3d 902, in which the appellate court affirmed the family court's order terminating spousal support based in part on its finding that appellant's impaired financial situation following the division of community assets was caused by her "imprudent and negligent investment practices." (*Id.* at p. 909.) Here, in contrast, the family court made no such finding. More important, even with the increased repair costs, Lisa would not be living near the MSOL of $50,000 per month per party. Rather, even with permanent spousal support of $5,000 per month, her monthly income would total less than $27,000. We are not persuaded that the family court abused its discretion in failing to fault Lisa for not living at an even lower standard of living, as contemplated by Brian's argument that she should sell the family residence and live in a smaller home.

## II.

### RETROACTIVE SUPPORT

Brian argues the family court abused its discretion in failing to exercise its discretion to consider section 4320 factors rather than relying on numbers generated by the DissoMaster computer program to determine retroactive support. However, DissoMaster is one of two computer software program widely used by courts to set temporary spousal support. "The benefit of the programs is that they enable a family law judge to input appropriate factual information about the income of the parties and have temporary spousal support computed in accordance with local rules, automatically taking into account the tax consequences of the order to each party. Unusual factors affecting temporary spousal support . . . require the judge to make adjustments to the calculations made by the basic computer program." (*In re*

11

*Marriage of Olson, supra*, 14 Cal.App.4th 1, 5, fn. 3.) Here, the family court recognized it has discretion to consider the section 4320 factors rather than use the program. By electing to use the program, the family court exercised its discretion. (Cf. *Kim v. Euromotors West/The Auto Gallery* (2007) 149 Cal.App.4th 170, 176–177 [finding an abuse of discretion where trial court "incorrectly believed that there can be no prevailing party when the parties agree to a pre-trial settlement, [and thus] the trial court failed to exercise its discretion to determine whether or not Kim was a prevailing plaintiff"].)

Brian argues the computer programs should not be used when the situation is unusual. He contends the four-and-a-half years between commencement of dissolution proceedings and the family court's ruling and the partial judgment constitute an unusual situation. However, "[t]emporary spousal support is utilized to maintain the living conditions and standards of the parties in as close to the status quo position as possible *pending trial and the division of their* assets and *obligations.*" (*In re Marriage of Burlini* (1983) 143 Cal.App.3d 65, 68, emphasis added.) The retroactive support covered the time before trial occurred on the reserved issues. In sum, Brian has not shown the family court abused its discretion in using the computer program.

III.

ATTORNEY FEES

Finally, Brian contends the trial court abused its discretion in issuing an attorney fee award against him and in favor of Lisa pursuant to sections 2030 and 2032.

Section 2030, subdivision (a)(1) provides in relevant parts that in dissolution proceeding, "the court shall ensure that each party has access to legal representation, including access early in the proceedings, to preserve each party's rights by ordering, if necessary based on the income and needs

12

assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." "When a request for attorney's fees and costs is made, the court shall make findings on whether an award of attorney's fees and costs under this section is appropriate, whether there is a disparity in access to funds to retain counsel, and whether one party is able to pay for legal representation of both parties. If the findings demonstrate disparity in access and ability to pay, the court shall make an order awarding attorney's fees and costs." (§ 2030, subd. (a)(2).)

Section 2032 provides that the family court may award attorney fees under section 2030 when it would be "just and reasonable under the relative circumstances of the respective parties." (§ 2032, subd. (a).) "In determining what is just and reasonable under the relative circumstances, the court shall take into consideration the need for the award to enable each party, to the extent practical, to have sufficient financial resources to present the party's case adequately, taking into consideration, to the extent relevant, the circumstances of the respective parties described in Section 4320. The fact that the party requesting an award of attorney's fees and costs has resources from which the party could pay the party's own attorney's fees and costs is not itself a bar to an order that the other party pay part or all of the fees and costs requested." (§ 2032, subd. (b).)

Here, the family court concluded there was a disparity in access to funds based on Brian's past earnings, potential future earnings due to his intentional unemployment, and significantly greater separate assets. The court also found Brian had the ability to pay the attorney fees based on readily available assets. Evidence about Brian's past earnings and current

13

assets were presented at trial. The court also considered the section 4320 factors. In sum, it complied with the requirements of sections 2030 and 2032 in ordering Brian to pay one-third of Lisa's attorney fees.

Brian argues it is unjust and unreasonable to require him to pay a portion of Lisa's attorney fees when his income is "nearly equal" to Lisa's income. But the family court considered that argument, and concluded the similar financial circumstances were the result of Brian's intentional unemployment and Lisa's employment at maximum capacity. It would be unjust and unreasonable to reward Brian's behavior and dis-incentivize Lisa's behavior by concluding the parties have similar financial means. In sum, Brian has not shown the family court abused its discretion in ordering him to pay one-third of Lisa's attorney fees.

DISPOSITION

The judgment is affirmed. Respondent is awarded her costs on appeal.



DELANEY, J.


WE CONCUR:


SANCHEZ, ACTING P.J.


SCOTT, J.

14